896 F.Supp. 1482 (1995)
Floyd E. McDANIEL, Plaintiff,
v.
ALLIEDSIGNAL, INC., Defendant.
No. 94-0522-CV-W-3.
United States District Court, W.D. Missouri, Western Division.
August 24, 1995.
*1483 Jerry Kenter and John B. Boyd, Connaughton, Boyd & Kenter, P.C., Kansas City, MO, for plaintiff.
Jill Marchant Munden and David A. Sosinski, Allied-Signal Inc., Kansas City, MO, for defendant.

ORDER
ELMO B. HUNTER, Senior District Judge.
In this action, Floyd McDaniel alleges defendant AlliedSignal Inc.'s Kansas City Division (AlliedSignal) engaged in unlawful discrimination under the provisions of Title I of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12112 (1990) ("ADA"). Plaintiff claims that AlliedSignal was obligated under the ADA to provide him a reasonable accommodation that would cure or mitigate his disability to the extent that his required security clearance would not be revoked by the United States Government. AlliedSignal now moves for summary judgment claiming the maintenance of a security clearance is a matter solely between an individual employee and the Government and thus Plaintiff's claim that Allied Signal unlawfully failed to reasonably accommodate him to the extent that his required security clearance would not be revoked has no merit.

ALLIEDSIGNAL'S RELATIONSHIP WITH THE DEPARTMENT OF ENERGY
AlliedSignal is a management and operating contractor for the United States Department of Energy ("DOE") at DOE's Kansas City Plant. (Def.'s Mot. Sum. Judg., App. B, ¶ 2). DOE and AlliedSignal entered into Contract No. DE-AC04-76DP00613 ("Contract") that provides for AlliedSignal to manage and operate the government-owned Kansas City Plant.[1]Id. AlliedSignal's primary mission is to produce non-nuclear components of nuclear weapons for the national defense. Id. at ¶ 3. A critical aspect of this mission is the protection and safeguarding of classified information relating to matters of national security. Id.
Under the security provisions of its contract, AlliedSignal agrees to conform to all DOE security requirements and not to permit individuals to have access to classified information except in accordance with the Atomic Energy Act, Executive Order 12356, *1484 and DOE's security regulations and requirements.[2] (Def's Mot. Sum. Judg., App. A, ¶ 2, App. B, ¶ 3). Because all AlliedSignal employees have access to classified information relating to national security,[3] the DOE contractually requires AlliedSignal to only employ those persons who obtain and maintain a DOE security access authorization ("security clearance") from the Government.[4] The DOE Albuquerque Operations Office issued Administrative Order 5631.2B (DOE AL Order 5631.2B) setting forth the policies, procedures, and objectives of the DOE Personnel Security Program.[5] The provisions of this Order apply to the DOE Albuquerque Operations Office (AL), DOE AL contractors, subcontractors, consultants and all personnel performing work for the Department as provided by law and/or contract. (DOE AL Order 5631.2B). Notably, this Order requires a contractor to establish and implement procedures within their organization to assure that information regarding any employee mental illness which may cause a significant defect in judgment or reliability is promptly brought to the contractor's attention. See DOE AL Order 5631.2B, Attachment III-1.E.1.(a). Once aware of this information, the contractor must promptly notify the appropriate DOE official with specific data.[6] DOE AL Order 5631.2B, Attachment III-1.E.1.(a)(b). Relevant to this action, when an employee who may have a mental illness has been hospitalized or is otherwise being treated, the contractor must provide the DOE with
(1) the employee's full name, social security number, and date of birth; (2) competent medical authority's opinion as to whether the employee has (or does not have) a mental illness which may cause a significant defect in judgment or reliability; (3) management action taken or contemplated; (4) after hospitalization, but prior to return to work, a current statement is required from a competent medical authority that the employee does not have a mental illness which may cause a significant defect in judgment or reliability; and (5) other details considered pertinent.
DOE AL Order 5631.2B, Attachment III-1.C.1.(b) and Attachment III-1.E.1.(a)(b).
Also relevant to this action, the DOE AL Order charges the contractor with the responsibility to establish and implement procedures within the organization to assure that derogatory information and other information of security interest concerning employees is promptly brought to the contractor's attention. DOE AL Order 5631.2B, Attachment III-2.C.1.(a). The Order specifically defines derogatory information as
information which indicates an individual is or has been subject to circumstances or engaged in conduct which indicates the individual is not reliable or trustworthy or may be subject to coercion, influence, or pressure which may cause the individual to act contrary to the best interests of the national security. Information is to be considered derogatory and reported if it reflects that an employee or applicant:
* * * * * *
d. Has questionable character. Character-type derogatory information includes, but is not limited to, the following:

*1485 (1) Arrest, except minor traffic violations for which a fine of $100.00 or less is imposed. Note that any alcohol or drug-related arrests must be reported regardless of disposition and/or amount of fine.
* * * * * *
(3) Alcoholism, except as becomes known through voluntary involvement in Employee Assistance Programs. However, failure to successfully complete the program negates the reporting exception in such cases.
DOE AL Order 5631.2B, Attachment III-2.B.3. Once aware of this derogatory information, the contractor must promptly notify the appropriate DOE official with the specific relevant facts. DOE AL Order 5631.2B, Attachment III-2.C.1(b).

PLAINTIFF'S BACKGROUND AT ALLIEDSIGNAL
Plaintiff was hired by Defendant on July 21, 1977, as an electrical-mechanical inspector trainee and was ultimately promoted to the position of Electrician. On November 14, 1977, Plaintiff was granted the required security clearance from the Government.
On September 3, 1985, AlliedSignal Medical Director Dr. Easterday received a phone call from Plaintiff's wife who reported that she had hospitalized Plaintiff at the Truman Medical Center psychiatric ward for treatment of depression. (Pl.'s Personnel Security File, 9-3 85 Memorandum to E.C. McGurren[7] from J.E. McLaury[8]). Mrs. McDaniel indicated in her phone call that the depression started after the death of Plaintiff's father approximately two years earlier, and that he had periodically visited a psychologist but that the condition continued to worsen until it became necessary for hospitalization. Id. As a result of this call, Dr. Easterday immediately put Plaintiff on two weeks medical leave. Id. Plaintiff returned to work on September 16, 1995. On September 25, 1985, AlliedSignal sent Dr. Brillantes, Plaintiff's doctor, a fitness for duty questionnaire.[9] Although Dr. Brillantes did not respond to this questionnaire until August 20, 1986, he ultimately stated in the questionnaire that continuing treatment on an outpatient basis was necessary, and that although in his opinion Defendant had a mental illness which may cause a defect in judgment or reliability, it was not of a nature which may cause a significant defect in judgment or reliability. (Pl.'s Personnel Security File, 8-20-86 Fitness for Duty Statement by Dr. Brillantes) (emphasis added).
In November of 1987, it came to the attention of AlliedSignal that Plaintiff was hospitalized at the Charter Hospital of Overland Park, Kansas, from November 3, 1987, through November 25, 1987, for treatment of a mental illness. (Pl.'s Personnel Security File, 12-22-87 Memorandum from L.K. Williams[10] to Tom Uko[11]). Plaintiff was under the care of Dr. Billingsley, a psychiatrist, and was treated for a major depression. Id. A Fitness for Duty Statement, dated December 16, 1987, was received from Dr. Billingsley, in which he stated that continuing treatment was required but that Plaintiff did not, in his opinion, have a mental illness which would cause a defect in judgment or reliability. Id. Based on the Fitness for Duty Statement and an examination by Bendix Medical Staff, Plaintiff returned to work on December 1, 1987. Pursuant to DOE AL Order 5631.2B, Attachment III-1.C.1.(b) and Attachment III-1.E.1.(a)(b), all the preceding information regarding this hospitalization, as *1486 well as the hospitalization at Truman Medical Center from September 2, 1985, to September 11, 1985,[12] was furnished by AlliedSignal security personnel to DOE security personnel in a memorandum dated December 22, 1987. Id.
By memorandum dated September 18, 1989, AlliedSignal security personnel notified DOE security personnel, as required by DOE AL Order 5631.2B, Attachment III-2.B.3 and III-2.C.1(b), of Plaintiff's arrest for driving while intoxicated and a burned-out taillight, his guilty plea to these charges, and the sentence imposed. (Def's Mot. Sum. Judg., App. A, ¶ 3). The memorandum attached a signed statement by Plaintiff that summarized the charges and the sentence. Id.
On January 14, 1991, Plaintiff formally was notified in person that his security clearance authorization was suspended by the authority of Rush O. Inlow, Assistant Manager for Safeguards and Security, Albuquerque Operations Office. (Pl.'s Personnel Security File, 1-14-91 Memorandum from J.E. McLaury to File). Plaintiff's blue badge was confiscated and he was issued a red badge pending final resolution of his security clearance eligibility. Id.
Following this suspension, it came to the attention of AlliedSignal that Plaintiff was hospitalized from January 21, 1991, through February 21, 1991, at the Charter Hospital, under the care of Dr. Kirubakaran, Psychiatrist, for alcoholism. (Pl.'s Personnel Security File, 4-30-91 Memorandum from C.D. Miller[13] to Charles Ross[14]). A Fitness for Duty Statement, dated April 23, 1991, was received from Dr. Kirubakaran, in which he stated that continuing treatment was required but that Plaintiff did not, in his opinion, suffer from a mental illness which would cause a defect in judgment or reliability. Id. Pursuant to DOE AL Order 5631.2B, Attachment III-1.C.1.(b) and Attachment III-1.E.1.(a)(b), this hospitalization information was furnished by AlliedSignal security personnel to DOE security personnel in a memorandum dated April 30, 1991. Id.
On May 29, 1992, Rush Inlow sent Mr. McDaniel a letter concerning the status of his security clearance. (Def.'s Mot. Sum. Judgment, App. A, ¶ 6). Mr. Inlow states in an affidavit that he "provided a copy of Title 10 Code of Federal Regulation (C.F.R.) Part 710, `Criteria and Procedures for Determining Eligibility for Access to Classified Matters or Significant Quantities of Special Nuclear Material' and advised Mr. McDaniel of his right to a hearing on the issue of his eligibility for continuation of his security clearance." Id.
Mr. McDaniel exercised his right to a hearing on this matter and one was scheduled for October 29, 1992, at the Kansas City Plant. Id. at ¶ 7. The hearing was abbreviated due to Mr. McDaniel's inability to participate in the hearing. Id. Another hearing was scheduled for August 12, 1993, and then rescheduled to August 18, 1993, at the same location. Id. By memorandum signed August 4, 1993, however, Mr. McDaniel withdrew his request for a hearing and submitted documentary evidence from three physicians on his behalf. Id.
Mr. Inlow states that he confirmed with Mr. McDaniel by letter dated September 7, 1993, his election not to have a hearing and advised him that DOE would review the case on the basis of all information submitted. Id. at ¶ 8. He then referred the case to the Director, Office of Security Affairs, DOE, Washington, DC, who by DOE Regulation 10 C.F.R. § 710.22(h) (1987), is charged with making the final decision on continuance of a security clearance. Id.
Mr. McDaniel was notified by letter on November 15, 1993, that his security clearance was revoked and the reasons in support of that decision. Id. at ¶ 9. The President of AlliedSignal was also notified by letter by the Director of the Personnel Security Division *1487 of this revocation but without specification of the reasons in support of that decision. Id.

ISSUES BEFORE THE COURT
At a meeting before the Court on October 17, 1994, counsel for Defendant and counsel for Plaintiff agreed that the legal issues raised in this action are:
(1) Is a security clearance a "qualification" for Plaintiff's job under the ADA?
(2) Is a security clearance an "essential function" of Plaintiff's job under the ADA?
(3) When an employer knows that a disability will result in the loss of a security clearance, does an employer have a duty to accommodate that disability by providing medical care that cures or mitigates the disability to the extent that a security clearance would be assured?
(Def.'s Mot. Sum. Judgment, App. D).

STANDARD OF REVIEW
To decide whether summary judgment is appropriate the Court must satisfy Fed. R.Civ.P. 56(c). Pursuant to the rule, summary judgment is proper only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
The moving party bears the burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To determine whether the moving party has satisfied the burden, the Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and must resolve all reasonable doubts against the moving party. Anderson, 477 U.S. at 255, 106 S.Ct. at 2514; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986). Notably, "Rule 56(e) ... requires that the nonmoving party go beyond the pleadings and by [his] own affidavits, or by the `depositions, answers to interrogatories, and admissions on file,' [plaintiff must] designate `specific facts showing there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. at 2553.

DISCUSSION
The general rule under the ADA is that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Relevant to this action, the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). It is this provision that Defendant contends Plaintiff does not satisfy, asserting that Plaintiff is not a "otherwise qualified individual" for purposes of the ADA.
The statute itself defines the term "qualified individual with a disability" to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8).

1. Is a security clearance an essential function of Plaintiff's employment position?
As a preliminary matter, legislative history strongly indicates that Congress intended retention of a government security clearance to qualify as an essential job function under the ADA:
The Committee also notes that the federal government, in granting national security clearances, takes into account current or *1488 former drug or alcohol use in denying or terminating such clearances. The Committee recognizes that any function of any employment position that requires a security clearance is an essential function of the employment position.

H.R.Rep. No. 485(II), 101st Cong., 2nd Sess. 57, reprinted in 4 U.S.C.A.N. 339 (1990).
Notably, the ADA specifically requires consideration to be given to "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(i).
Plaintiff does not dispute that AlliedSignal, in its capacity as a contractor for the DOE, has always considered a security clearance to be an essential function of all employment positions at the Kansas City Plant. That AlliedSignal considers this to be so is evidenced by the following examples.
First, Defendant's Employee Handbook explicitly states that "[i]t is a condition of employment that [an employee] must be able to obtain and retain a government Q-level security clearance." AlliedSignal Employee Handbook at p. 26. The Handbook further states that "[i]f the government denies or revokes [an employee's] security clearance, [] employment will be terminated." Id. See 29 C.F.R. § 1630.2(n)(3)(ii) (evidence of whether a particular function is essential includes "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job.")
Next, the collective bargaining agreement negotiated between AlliedSignal and the labor union to which Plaintiff was a paid member ["Agreement"] further provides evidence that Defendant considers a security clearance to be an essential function of all employment positions at AlliedSignal:
The Union agrees that, where Government security regulations are placed upon [AlliedSignal], such regulations will govern the acceptance or rejection of an employee for work coming under those regulations. The Union agrees that it will not file a grievance where the Company has removed from the payroll any employee who has not received a security clearance or whose security clearance has been revoked. This provision does not affect any rights or remedies available through Government procedures.
Agreement at pp. 73-74. See 29 C.F.R. § 1630.2(n)(3)(v) (evidence of whether a particular function is essential includes "[t]he terms of a collective bargaining agreement.").
Lastly, the required distribution of AlliedSignal's new hire "security packet," containing United States Government and DOE security documents, forms and information, which must be provided to and completed by all AlliedSignal employees in order for the Government to process and issue security clearances, is further evidence that Defendant considers a security clearance to be an essential function of all employment positions at AlliedSignal.
As additional support for the finding that a government security clearance is an essential function of the employment position from which Plaintiff was terminated, this Court finds the case of Guillot v. Garrett, 970 F.2d 1320 (4th Cir.1992) to be persuasive authority in that direction. In Guillot, the Fourth Circuit Court of Appeals explicitly found that under section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ["The Rehabilitation Act"], a required security clearance issued by the United States Navy was an essential function of a civilian computer specialist position.[15]Id. at 1327.
*1489 Based on the legislative history of the ADA, the mandatory consideration of evidence involving "the employer's judgment as to what functions of a job are essential," and relevant case law on this subject under the Rehabilitation Act, this Court FINDS that a security clearance under the facts here are an essential function of the employment position Plaintiff held. Based on this finding, the Court must now determine whether Plaintiff could have performed the essential function of maintaining his government security clearance with reasonable accommodation from Defendant.

2. Reasonable Accommodation
Plaintiff asserts that AlliedSignal was obligated under the ADA to provide him a reasonable accommodation that would cure or mitigate his alleged disability to the extent that his required security clearance, found by this Court to be an essential function of his employment, would not be revoked by the United States Government.
To establish a prima facie case under the ADA, a plaintiff must show that: (1) he was "disabled" as defined by the ADA; (2) he was qualified, with or without accommodation, to do the job; and (3) his termination amounted to unlawful discrimination based on his disability. White v. York Int'l Corp., 45 F.3d 357, 360-61 (10th Cir.1995); Tyndall v. Nat'l Educ. Ctrs., 31 F.3d 209, 212 (4th Cir.1994). Since a plaintiff must show that he was "qualified" as part of the prima facie case, and since that term has been defined to include the concept of "reasonable accommodation," a plaintiff must, in order to make out a prima facie case, show that he can perform the essential functions of the job in spite of the disability either (a) with no need for accommodation, or (b) with a reasonable accommodation.[16]
As a preliminary matter, Plaintiff seems to concede that he cannot perform the essential function of his job (maintaining a security clearance) unless he receives some sort of accommodation from AlliedSignal. There is absolutely no evidence in the record from which to presume, however, that AlliedSignal would have the power to make certain that Plaintiff's required security clearance would not be revoked by the DOE.[17] Even if *1490 AlliedSignal provided Plaintiff with the resources to cure or mitigate his alleged disability,[18] this accommodation of Plaintiff's alleged disability does not guarantee that Plaintiff's government security clearance would not be revoked by the DOE. Nor would curing or mitigating Plaintiff's alleged disability affect AlliedSignal's duty to report to the Government information regarding any employee mental illness which may cause a significant defect in judgment or reliability or the duty to report alcohol or drug-related arrests of an employee.
In a nutshell, Plaintiff's claim demands that government contractors such as AlliedSignal be able to effect and assure the outcome of security clearance decisions and to guarantee that an employee's disability does not influence that outcome as part of the employer's duty to "reasonably accommodate" under the ADA. Because the security clearance process is committed by law to federal agency discretion, however, this Court finds that AlliedSignal cannot effect and assure the outcome of the Government's security clearance decisions.
The United States Supreme Court has held that an agency's decision to grant, deny, or revoke a security clearance is not open to further review. Department of Navy v. Egan, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). The Egan Court noted that the authority to protect national security information is granted to the President by the U.S. Constitution.
His authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant.
Egan, 484 U.S. at 527, 108 S.Ct. at 824.[19]
In Egan, the issue was whether the Merit Systems Protections Board ["MSPB"] had authority to review the decision of the Secretary of the Navy to revoke Egan's Department of Navy security clearance. However, the decision in Egan was not based on any specific grant of authority to the MSPB or the military capacity of the defendant. Rather, Egan was based on the President's constitutional authority to make the final call as to who has access to national security information. The Secretary of the Navy has that authority for the Department of Navy by direct grant from the President, who obtains his authority directly from the Constitution. The Secretary of Energy[20] has the same direct grant of power from the President for security clearances from DOE. See Exec. Order No. 10290, 16 Fed.Reg. 9795 (1951). See also Exec. Order No. 10865, 25 Fed.Reg. 1583 (1960).
Because the decision to revoke a security clearance is solely the Government's, Allied-Signal *1491 cannot assure that even the total elimination of an employee's disability would result in the Governments' decision to continue an employee's security clearance. As the court explains in the corresponding circumstances of Guillot, because a security clearance is a requirement of the position and the Government has revoked this clearance, "it is evident that no amount of accommodation ... will render him able to `perform the essential functions of the position in question.'" Guillot at 1327.
In sum, the Court finds that AlliedSignal cannot accommodate the essential function of maintaining a government security clearance.[21] As the EEOC determined in its investigation of Plaintiff's claim, "there is insufficient evidence that [AlliedSignal] denied [Mr. McDaniel] a reasonable accommodation for his disability. [AlliedSignal] discharged [Mr. McDaniel] because of his inability to retain his `Q' clearance, which is a condition of employment imposed by the U.S. Government." (Def.'s Mot. Sum. Judg., App. C).
Based on the above discussion, the Court cannot find Plaintiff to be an individual with a disability who, even with reasonable accommodation in the form of curing or mitigating his alleged disability, can perform the essential function of maintaining a government security clearance pursuant to 42 U.S.C. § 12111(8).[22] Therefore, Plaintiff is not a "qualified individual" with a disability within the meaning of the statute. Because Plaintiff is not a "qualified individual" under the ADA, he his not covered by the Act and thus AlliedSignal does not have a duty to accommodate Plaintiff's disability by providing medical care that cures or mitigates Plaintiff's disability to the extent that a security clearance would be assured.[23]
Plaintiff also seems to allege that AlliedSignal has discriminated against him by using qualification standards that screen out an individual with a disability in violation of 42 U.S.C. § 12112(b)(6). According to EEOC regulations implementing the ADA, "qualification standards mean the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q).
The ADA specifically states, however, that an employer can utilize even those qualification standards that screen out individuals with disabilities on the basis of disability as long as the qualification standard is "job-related and consistent with business necessity." 42 U.S.C. § 12112(b)(6); see also 42 U.S.C. § 12113(a) (may be a defense to a charge of discrimination where job qualification is shown to be job-related and consistent with business necessity). Because the Court finds a security clearance to be an essential function of Plaintiff's employment position, it seems to go without saying that a security clearance is both job-related and consistent with business necessity. Accordingly, the Court finds that the qualification standard requirement of a security clearance to maintain Plaintiff's employment does not violate this section of the ADA.
*1492 Based on the above discussion, it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED.
IT IS SO ORDERED.
NOTES
[1] Operation of the Kansas City Plant is undertaken under the authority of the Atomic Energy Act of 1954, as amended ("AEA").
[2] The DOE criteria and procedures to obtain and retain security clearance are found at 10 C.F.R. § 710.
[3] Plaintiff alleges in his Opposition Brief that Defendant presents conflicting statements to the Court regarding whether everyone must have a security clearance at the AlliedSignal Kansas City Plant. Plaintiff's Opposition at p. 2. This Court finds no such conflict in the affidavits Defendant submitted in support of summary judgment.
[4] According to Steve Taylor, Acting Area Manager of the DOE's Kansas City Office, it is the physical configuration of the Kansas City Plant and the access of AlliedSignal employees to "Restricted Data," as defined under the AEA, that induced the DOE to require all persons employed at AlliedSignal to obtain and retain a DOE security clearance. (Def.'s Mot. Sum. Judg., App. B, ¶¶ 1-3).
[5] The authority to promulgate administrative orders such as this one is granted to the Department of Energy through the Atomic Energy Act, 42 U.S.C. § 2201 (1994).
[6] The Order designates an appropriate DOE official as the AL Area Manager, the Project Office Manager, the Contracting Officer, or the Director of the Security and Nuclear Safeguards Division.
[7] E.C. McGurren was the manager of security for AlliedSignal at this time.
[8] John McLaury was the Supervisor for Personnel and Vendor Security at AlliedSignal at this time. Mr. McGurren was his immediate supervisor.
[9] As noted above, when an employee who may have a mental illness has been hospitalized or is otherwise being treated, the contractor must provide the DOE with a "competent medical authority's opinion as to whether the employee has (or does not have) a mental illness which may cause a significant defect in judgment or reliability." DOE AL Order 5631.2B, Attachment III-1.C.1.(b) and 5631.2B, Attachment III-1.E.1.(a)(b).
[10] L.K. Williams was the Director of Human Resources at AlliedSignal until April of 1988.
[11] Tom Uko was the DOE Chief of the Administrative Branch for the Kansas City Area Office at this time.
[12] There is no evidence before the Court that this particular hospitalization was reported before this time to DOE security personnel.
[13] C.D. Miller was the Director of Human Resources at AlliedSignal at this time.
[14] Charles Ross was the Acting DOE Chief of the Administrative Branch for the Kansas City Area Office at this time.
[15] Since the Americans with Disabilities Act did not become effective for employers of 25 or more employees until July 26, 1992, there is a paucity of cases interpreting the ADA. Therefore, in attempting to construe the language of the statute, the Court must look to the legislative history of the ADA. The legislative history indicates that Congress intended that the terms and regulations issued under the ADA should track those of section 501 of the Rehabilitation Act. The Equal Employment Opportunity Commission ("EEOC") states that: "The range of employment decisions covered by this nondiscrimination mandate is to be construed in a manner consistent with the regulations implementing [] the Rehabilitation Act of 1973." EEOC Interpretive Guidance on Title I of the ADA, 29 C.F.R.App. § 1630.4.

Notably, the Rehabilitation Act of 1973 is a close relative of the ADA. The Rehabilitation Act prohibits discrimination against handicapped individuals and requires covered employers to make reasonable accommodation to those handicapped individuals who are otherwise qualified to perform the job duties of a particular position. The Rehabilitation Act, however, is limited to federal agencies, federal grant recipients and federal government contractors. When these protections were extended to employees of private employers through the ADA, Congress drew heavily from the language, definitions and concepts of the Rehabilitation Act of 1973. H.R.Rep. No. 485(II), 101st Cong., 2nd Sess. 23, reprinted in 4 U.S.C.C.A.N. 304-305 (1990).
[16] Although in the context of a discrimination action brought pursuant to the Rehabilitation Act, the Eighth Circuit Court of Appeals also has held that in order to make a prima facie case of discrimination on the basis of handicap, a plaintiff must initially meet the burden of providing evidence sufficient to make at least a facial showing that reasonable accommodation is actually possible. Arneson v. Heckler, 879 F.2d 393, 396 (8th Cir.1989). See also Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir.1991); White v. York Int'l Corp., 874 F.Supp. 342, 344 (W.D.Ok.1993). Because of the similarities between the ADA and the Rehabilitation Act of 1973, and their implementing regulations, cases brought under the Rehabilitation Act are instructive. Compare 29 C.F.R. § 1630.2(m) with 45 C.F.R. § 84.3(k)(1).
[17] Plaintiff contends that AlliedSignal "participated in the decision to revoke [Plaintiff's] security clearance." Plaintiff's Opposition at p. 4. In support of this contention, Plaintiff states that in letters dated December 3 and December 22, 1987, AlliedSignal specifically asks Plaintiff's treating psychiatric physicians to "assist them in making decisions regarding a security clearance." Id. Based on this language alone, Plaintiff asserts AlliedSignal was "very involved in the daily decisions regarding the revocation of [Plaintiff's] security clearance." Id.

Conversely, Defendant asserts, and in fact files the sworn affidavit of Rush Inlow, DOE Acting Assistant Manager for National Defense Programs, that while information and medical records relating to Plaintiff were obtained from AlliedSignal personnel pursuant to DOE AL Order 5631.2B, Attachment III-1.C.1.(b) and Attachment III-1.E.1.(a)(b), it was the DOE, and only the DOE, that conducted the security clearance investigation. (Def.'s Mot.Sum.Judg., App. A, ¶ 5). Mr. Inlow further stated under oath in his affidavit that it is the DOE, and only the DOE, that is charged with making the final decision on continuance of a security clearance. Id. at ¶ 8 (citing 10 C.F.R. § 710.22(h)).
Based on the evidence submitted to the Court in support of the instant motion, Plaintiff's conclusory allegation that AlliedSignal was "very involved in the daily decisions regarding the revocation of security clearance" fails to create a genuine issue of material fact to survive summary judgment.
[18] The notion that an employer is obligated to cure or mitigate an employee's disability as part of its duty to "reasonably accommodate" may be unreasonable in and of itself. Although a broad and flexible concept, the Court can find no guidance stating that "reasonable accommodation" is anything but changes to job requirements or working conditions that better enable an employee to perform the essential functions of the job, in spite of his disability. Although certainly not an exhaustive list, examples of reasonable accommodations in the statute include "job restructuring, part-time or modified work schedules; reassignment to a vacant position, acquisition or modifications of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). It is clear that the focus of reasonable accommodation is the employee's job, not the employee's disability.
[19] The Egan Court also specifically found that the general presumption of judicial review "runs aground when it encounters concerns of national security, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." Id.
[20] The delegation of power from the President to "the Commissioners of the Atomic Energy Commission" (AEC) is now a grant to the Secretary of Energy, to whom the functions of the AEC Commissioners were transferred by Congress pursuant to 42 U.S.C. §§ 5814, 7151, 7293.
[21] Even if an accommodation was feasible, it may not be reasonable. An accommodation is unreasonable if it would necessitate modification of the essential nature of the program or place undue burdens on the employer. Reigel v. Kaiser Foundation Health Plan, 859 F.Supp. 963 (E.D.N.C.1994); see also Larkins v. CIBA Vision Corp., 858 F.Supp. 1572 (N.D.Ga.1994) (citing EEOC Interpretive Guidance on Title I of the ADA, 29 C.F.R.App. § 1630.2) (where the court held that a defendant is not required to eliminate an essential function of the employment position in order to accommodate plaintiff). The essential nature of the work being done at AlliedSignal concerns the protection of national security. Elimination of the required security clearance invariably may necessitate modification, and perhaps even elimination, of the essential nature of the AlliedSignal program. Further, this may obviously place an undue burden, as defined by the ADA, upon AlliedSignal.
[22] The ADA specifically states that "[i]t may be a defense to a charge of discrimination [that] ... performance [of an essential function of the job] cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113(a).
[23] Based on the precise language of the ADA, the Court finds it unnecessary to address whether a security clearance is a "qualification" for Plaintiff's job under the ADA.