## PUBLIC SERVICE ELECTRIC & GAS COMPANY, Plaintiff,

v.

## LOCAL 94 INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Defendant.

### No. CIV. A. 99–3634 (GEB).

United States District Court,
D. New Jersey.

April 6, 2001.

Patrick Westerkamp, Newark, NJ, for Plaintiff.

Brian Curtis, Paul Montalbano, Schneider, Goldberger, Cohen, Finn, Solomon, Leder & Montalbano, P.C., Kenilworth, NJ, for Defendant.

## MEMORANDUM OPINION

HUGHES, United States Magistrate Judge.

This matter comes before the Court on motion by Plaintiff Public Service Electric & Gas Company ("PSE & G") for summary judgment requesting the Court to declare that site access issues are not subject to arbitration under the grievance/arbitration provision of the Collective Bargaining Agreement ("CBA") between PSE & G and Local 94, International Brotherhood of Electrical Workers ("Local 94"). Defendant Local 94 opposes the motion and has submitted a cross-motion for summary judgment requesting the Court to order PSE & G to submit to arbitration the issue of the revocation of site access for Vincent Forte and all other Local 94 represented employees whose employment may be adversely affected. The parties have consented to the exercise of jurisdiction by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, for all purposes. Oral Argument was conducted on December 18, 2000 and the matter was taken under advisement. For the following reasons, Plaintiff's motion for summary judgment is granted and Defendant's cross-motion for summary judgment is denied in part, and denied without prejudice in part.

## I. BACKGROUND & PROCEDURAL HISTORY

This action arises from a dispute between Plaintiff PSE & G and Defendant Local 94 concerning the arbitrability of a site access issue in the context of a grievance challenging the discharge of Union Member Vincent Forte. Plaintiff PSE & G is a public utility incorporated under the laws of the State of New Jersey to provide safe and dependable electric and gas energy within its service territory. Statement of Undisputed Material Facts ¶ 1. Defendant Local 94 is an unincorporated labor organization commonly known as a union as the term is defined in Section 2(d) of the Labor–Management Relations Act. Id. ¶ 2. Since 1943, Local 94 and its predecessors have bargained collectively with PSE & G on behalf of employees engaged in the generation and distribution of electricity. Id. ¶ 9. Local 94 is recognized by PSE & G as the exclusive representative for bargaining unit members including those assigned to the Artificial Island nuclear stations. Pl.'s Compl. at ¶ 10. Vincent Forte is a Local 94 bargaining unit member.

Among the facilities operated by PSE & G are Salem I & II, and Hope Creek nuclear generating stations on Artificial Island in Salem County, New Jersey. Statement of Undisputed Material Facts ¶ 4. There is a fence which surrounds these stations and the land and the buildings inside the fence are know as the "unescorted access" or "protected" areas. Id. ¶ 6. Out of about 2000 employees who work on Artificial Island, Local 94 represents approximately 800. Id. ¶¶ 7 and 8. Approximately 99% of the union represented employees work in the unescorted access area. Id. ¶ 9. Employees of independent contractors also work at the nuclear stations and unions, other than Local 94, represent some of these workers. Id. ¶¶ 12 and 13.

The operation of the Island's generating stations is licensed and regulated by the Nuclear Regulatory Commission ("NRC") pursuant to the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011–2394. As an NRC licensee, PSE & G must comply with applicable rules promulgated by the NRC, which are contained in 10 C.F.R. Part 0–199. Id. ¶ 17. One of these rules

requires a licensee to design and implement a procedure "to limit unescorted access to vital areas during nonemergency conditions to individuals who require access in order to perform their duties." *Id.* ¶ 18 (quoting 10 C.F.R. § 73.55(7)(i)). Licensees including PSE & G are responsible for granting, denying, or revoking unescorted access to their own employees, contractors, and vendors. *Id.* ¶ 22 (referring to 10 C.F.R. § 73.56(a)(4)).

PSE & G and Local 94 entered into their current Collective Bargaining Agreement effective May 1, 1996. *Id.* ¶ 25. Article IX of the CBA provides for a grievance/arbitration procedure agreed upon by PSE & G and Local 94. *Id.* ¶ 33. This grievance/arbitration procedure was invoked by Local 94 after the termination of Mr. Forte, who until March 9, 1998, worked for PSE & G at the Hope Creek Nuclear Station. *Id.* ¶ 36. Mr. Forte had held the position of Nuclear Technician/Mechanical Welder and had unescorted access under the Personal Access Program ("PAP") established by PSE & G pursuant to 10 C.F.R. § 73.56. *Id.* ¶ 39. In August 1997, Forte's site access privilege was suspended following his third arrest for driving under the influence ("DUI"). *Id.* ¶ 40. PSE & G found temporary work for Forte that did not require site access. *Id.* ¶ 41. In November 1997, Forte was convicted of the DUI charge and forfeited his driver's license to the State of New Jersey. *Id.* ¶ 42. In January of 1998, PSE & G indefinitely continued the suspension of Forte's site access privilege. *Id.* ¶ 43. PSE & G discharged Forte on March 9, 1998. *Id.* ¶ 44.

PSE & G and Local 94 were unable to settle the grievance as to whether Forte had been discharged for just cause and the matter was submitted for arbitration with the American Arbitration Association (hereinafter "AAA"). *Id.* ¶ 71. The AAA appointed as arbitrator Shyam Das, Esquire. *Id.* ¶ 72. Arbitrator Das opened the hearings on April 7, 1999. *Id.* ¶ 76. The parties then stipulated that the issues for resolution were "[w]hether the discharge of Vinni Forte was for just cause" and "[i]f not, what shall the remedy be?" *Id.* ¶ 78. Immediately thereafter, PSE & G submitted a motion in limine to the arbitrator requesting the arbitrator to "bar Local 94 from presenting evidence touching on the January 1998 decision to revoke the grievant's unrestricted access to the Company's nuclear facilities." Pl.'s Compl. ¶ 25.

Plaintiff PSE & G filed the present action in Federal District Court, District of New Jersey, requesting a declaratory judgment that the site access issue is not subject to the arbitration provisions of the CBA, or any other agreement between PSE & G and Local 94, and seeking an Order staying Defendant Local 94 from proceeding with the arbitration on the site access question. *See* Pl.'s Compl. Defendant Local 94 filed an Answer and cross-motion requesting a declaratory judgment that site access is subject to arbitration and for an Order from the Court requiring PSE & G to submit to arbitration the issue of revocation of site access for Vincent Forte. Def.'s Answer and Countercl. The arbitration hearing has been stayed pending resolution of the arbitrability issue by the United States District Court for the District of New Jersey. Statement of Undisputed Material Facts ¶ 80.[1]

1. Defendant Local 94 disputes Plaintiff's Statement of Undisputed Facts ¶ 80 by objecting to "the implication that Arbitrator Das rendered a decision or ruled otherwise that he did not have the authority to determine whether the revocation of site access resulting in discharge was a term and condition of employment protected under the [CBA] to which the parties agree to be bound." Def.'s Statement of Disputed Facts.

The first issue to be addressed by the Court is whether there is anything in the NRC regulations which prevent site access issues from being arbitrated pursuant to a grievance/arbitration provision in a collective bargaining agreement. If not, then the next issue to be addressed is whether the arbitration provision in the operative collective bargaining agreement covers revocation or denial of site access authorization.

## II. STANDARD FOR SUMMARY JUDGMENT

A court may enter summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has met its initial burden, the non-moving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the differences at trial. *Id.* at 324, 106 S.Ct. 2548. In deciding whether there is a genuine issue of material fact, the Court must view the evidence in the light most favorable to the non-moving party, and the non-moving party receives the benefit of all reasonable inferences that may be drawn from the underlying facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Baker v. Monroe Township*, 50 F.3d 1186, 1190 (3d Cir.1995).

## III. DISCUSSION

### A. DO THE NRC REGULATIONS PREVENT SITE ACCESS ISSUES FROM BEING ARBITRATED?

### 1. NRC REGULATIONS

■ By enacting the Atomic Energy Act of 1954, 42 U.S.C. § 2011 and the Energy Reorganization Act of 1974, 42 U.S.C. § 5841, which established the NRC and transferred to it the licensing jurisdiction over private nuclear power plants which were formerly exercised by the Atomic Energy Commission, Congress intended that the "federal government maintain complete control of the safety and 'nuclear' aspects of energy generation," by regulating safety aspects involved in the construction and operation of nuclear power plants. *Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). The NRC's "prime area of concern in the licensing context . . . is national security, public health, and safety." *Id.* at 207, 103 S.Ct. 1713 (citation omitted). The NRC is authorized to prescribe regulations, including standards and restrictions governing the design, location and operation of nuclear facilities in order to protect health and to minimize danger to life and property. *Susquehanna Valley Alliance v. Three Mile Island*, 619 F.2d 231, 235–36 (3d Cir.1980) (*citing* 42 U.S.C. § 2201(i)(3) (1976 & Supp. I)).

Pursuant to NRC regulations, nuclear power plant licensees must have an approved Physical Security Plan that provides protection against sabotage and unreasonable risk to the public health and safety. *See* 10 C.F.R. § 73.55 (2000). In May 1991, the NRC implemented a rule, 10 C.F.R. § 73.56, mandating that licensees establish an "access authorization program" and that the program be "incorpo-

rated into the site Physical Security Plan as provided for by 10 C.F.R. § 50.54(p)(2) and implemented." *See* 10 C.F.R. § 73.56 (2000). According to § 50.54(p)(2), changes may be made to the Physical Security Plan without prior Commission approval as long as the changes do not decrease the effectiveness of the safeguards in the Plan. *See* 10 C.F.R. § 50.54(p)(2) (2000). However, the licensee is required to maintain records of the changes for three years from the date of the change and must submit a report describing each change within two months after the changes have been made. *See id.*

The NRC's objective in requiring licensees to establish a program for granting unescorted access to protected areas of a nuclear power plant "is to provide high assurance that individuals granted unescorted access are trustworthy and reliable and do not constitute an unreasonable risk to public health and safety, including the potential to commit radiological sabotage." 10 C.F.R. § 73.56(b)(1); *see also* NRC Regulatory Guide 5.66, Access Authorization Program for Nuclear Power Plants, June 1, 1991. The access authorization program must include a background investigation, psychological assessment and behavioral observation of individuals to be granted unescorted access. *See* 10 C.F.R. § 73.56(b)(2). Furthermore, pursuant to 10 C.F.R. § 73.56(a)(4), a "licensee may accept part of an access authorization program used by its contractors, vendors, or other affected organizations and substitute, supplement, or duplicate any portion of the program as necessary to meet the requirements of this section." 10 C.F.R. § 73.56(a)(4).

The rule also requires the implementation of a review procedure of denials or revocations of unescorted access authorization and sets forth minimum standards for such a procedure. 10 C.F.R. § 73.56(e).

Section 73.56(e) of Title 10 of the Code of Federal Regulations provides:

> Each licensee implementing an unescorted access authorization program under the provisions of this section shall include a procedure for the review, at the request of the affected employee, of a denial or revocation by the licensee of unescorted access authorization of an employee of the licensee, contractor, or vendor, which adversely affects employment. The procedure must provide that the employee is informed of the grounds for denial or revocation and allow the employee an opportunity to provide additional relevant information, and provide an opportunity for an objective review of the information on which the denial or revocation was based. The procedure *may* be an impartial and independent internal management review.

10 C.F.R. § 73.56(e) (emphasis added).

The regulatory guide which accompanies the rule provides an approach acceptable to the NRC by which a licensee can meet the requirements of an access authorization program. NRC Reg. Guide 5.66, June 1, 1991. This approach is set forth in "Industry Guidelines for Nuclear Power Plant Access Authorization Programs" (NUMARC 89–01) published in 1989 by the Nuclear Management Resources Council (hereinafter "NUMARC"). The NRC endorses the NUMARC Guidelines with two exceptions. One of these exceptions refers to the review procedure as addressed in the guidelines. Section 7.2 of the Guidelines provides:

> Each permanent employee of a utility whose employment is or will be terminated as a direct result of denial or revocation of unescorted access authorization will: (1) be informed of the basis of a denial or revocation ...; (2) have the opportunity to provide additional information; and (3) have the decision ...

reviewed by another designated manager ... who is ... independent of the individual who made the initial decision.

.    .    .    .    .

An alternative review process which is independent and impartial is acceptable. Where applicable, grievance review procedures contained in a collective bargaining agreement covering the bargaining unit of which the permanent employee is a member will meet this requirement and may be used for this purpose. If an alternative review process is used, the utility will include a description of the review process to be used in the procedures that meet this guideline.

The NRC explanation for excepting this provision is as follows:

The Guidelines specify a review procedure specifically for *permanent* employees of licensees. The rule requires that a review procedure be available to all employees of a licensee, contractor, or vendor, *temporary or permanent,* whose employment is adversely affected when unescorted access is denied or revoked by the licensee.

NRC Reg. Guide 5.66, June 1, 1991 (emphasis added).

## 2. *NATIONAL LABOR RELATIONS ACT*

Congress, through the National Labor Relations Act, 29 U.S.C. § 151, has regulated labor-management relations as well and has set forth that it is "the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining." 29 U.S.C. § 151. Section 173 of the Act provides:

Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.

29 U.S.C. § 173(d). It is well settled law that arbitration is the preferred method for resolving disputes between a union and an employer. *See E.M. Diagnostic Sys., Inc. v. Local 169,* 812 F.2d 91, 94 (3d Cir.1987); *see also AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (stating that certain principles applied in determining whether a grievance is subject to arbitration "have led to continued reliance on arbitration, rather than strikes or lockouts, as the preferred method of resolving disputes arising during the term of collective-bargaining agreement.").

The relevant provisions of the CBA agreed to by PSE & G and Local 94 are: Article II(A); Article V(A)(1); and Article IX(A). Article II(A) provides:

The management of the Company and the direction of the working forces including the right to hire, suspend, *discharge for proper cause,* promote, demote ... for other proper and legitimate reasons are recognized to be in the Company, except as otherwise provided in this Agreement. (emphasis added).

Article V(A)(1) of the CBA provides:

The safety rules and regulations established by the Company or governmental authority shall be strictly adhered to by both the employees and the Company, and the Company shall enforce these rules and regulations uniformly.... Representatives of the Company and the Union shall meet at the request of either to discuss the reasonableness of the safety rules and regulations. Proposed changes in safety rules and regulations

shall be submitted to the Union for full discussion before becoming effective.

Article IX of the CBA provides:

Should any dispute or difference arise between the Company and the Union or its members as to the *interpretation, application, or operation of any provision of this Agreement,* not specifically settled in said Agreement, both parties shall endeavor to settle these in the simplest and most direct manner. (emphasis added).

A five-step procedure to settle the dispute follows with the relevant fifth step providing: "If the dispute or difference is not settled in the fourth step above, either party may request that the matter be referred to arbitration." Art. IX(F), Pl.'s Ex. F.

### 3. *WHETHER 10 C.F.R. § 73.56 PERMITS ARBITRATION AS THE REVIEW APPEAL PROCESS*

Neither party has cited authority directly on point as to whether NRC regulations preclude the revocation or denial of site access authorization from being arbitrated pursuant to an arbitration provision in a collective bargaining agreement. However, both PSE & G and Local 94 refer to the historical record, specifically the NRC's evaluation and response to public comments to the proposed regulation 73.56 published in the Federal Register. The parties use the NRC's response to public comments to support their respective arguments as to whether the NRC regulations allow or endorse the arbitration procedure included in a collective bargaining agreement as a review procedure for revocation and/or denials of site access authorization.

Before implementing the rule, the NRC published for public comment a proposed rule to require access authorization programs at nuclear power plants and the NUMARC Guidelines. *See* Access Autho-

rization Program for Nuclear Power Plants, 56 Fed.Reg. 18,997 (April 25, 1991). Comments were received from industry groups such as the NUMARC, labor unions, and various government agencies. *See id.*

According to the published evaluation and response to the public comments, the NRC acknowledged that, as reflected by the comments that had been submitted, there was concern that the review procedure required by the original proposed NUMARC Guidelines did not sufficiently protect the worker's interest. *Id.* at 19,-002. Labor unions expressed concern that the Guidelines were developed without input from the bargaining unit or any worker representatives. *See id.* at 19,005. "The unions believed that issues involved in granting access authorization were conditions of employment and as such should be subject to the collective bargaining process." *Id.* In its discussion of this issue, the NRC stated "[i]t should be noted that the Commission never intended that any review procedure that already exists in a bargaining agreement be abandoned." *Id.* at 19,002. The NRC responded further to these comments by stating, "[i]t is not the intent of the Commission to exclude from consideration or to require consideration of access authorization issues in the collective bargaining process as long as the resolution of these issues is within the limits set by this rulemaking." *Id.* at 19,006.

The NRC replied to comments from industry questioning the necessity of a separate review procedure by stating:

In the Commission's view, it is not sufficient reason to dispense with the review procedures simply because there are other remedies that are available to the aggrieved person. Although in theory an aggrieved individual could commence an action in a State or Federal court, such litigation could be costly and time-

consuming for the average employee. In addition, the Commission has not seen evidence that union collective bargaining agreements (where they exist) would automatically include denial or revocation of access authorization as a grievable action. In any case, the latter would not be available in nonunion plants. Further, if procedures under collective bargaining agreements are readily available for this purpose in the absence of a required review procedure, . . . there is no basis for objection to the review portion of the rule in unionized plants, *since the rule would allow the use of a grievance procedure for review of denials or revocations of access authorizations.*

*Id.* at 19,002 (emphasis added)..

Nevertheless, PSE & G asserts that the historical record is, at best, ambiguous as to whether the NRC regulations support arbitration of site access appeals. *See* Pl.'s Br. at 15–16. PSE & G claims that the fact that the NRC "embraced virtually every [current NUMARC] Guideline element with the exception of Section 7.2," is critical. *Id.* "Had it received the NRC's vote of confidence, Section 7.2 would have ratified the qualified support for arbitration which appeared in the Commission's April 1991 commentaries." *Id.* at 16. In sum, "[b]y ruling that Section 7.2 'does not apply' the Commission apparently withdrew its tacit consent to the use of existing grievance/arbitration procedures for access appeals." *Id.*

However, the NRC explanation for the exception specifies that the rule requires that a review procedure be available for all employees of the licensee, contractor or vendor, temporary or permanent whose employment is adversely affected when authorized access is denied or revoked. By comparison the Guidelines provide for such a procedure solely for permanent employees of licensees. *See* Reg. Guide 5.66, Pl.'s

Ex. I. Significantly, the NRC is silent as to the portion of Section 7.2 that allows for a grievance review procedure contained in a collective bargaining agreement as an acceptable alternative review process, which indicates that the NRC did not reject this position. *See id.*

Furthermore, upon review of the NRC's response and evaluation to public comment published in the Federal Register it is apparent that the NRC never intended to preclude a grievance/arbitration provision included in a collective bargaining agreement as a review procedure for site access denials or revocations. In fact, the Court finds the historical record persuasive that the NRC's intent was to permit an arbitration provision to be utilized as the appeal process for revocation or denial of site access authorization when appropriate, especially in consideration of the NRC's response that it was not its intent to "exclude from consideration or to require consideration of access authorization issues in the collective bargaining process." 56 Fed.Reg. at 19,006.

More importantly, the language of the regulation itself supports this argument. Section 73.56(a)(4) allows a licensee to "accept part of an access authorization program used by its contractors, vendors, or *other affected organizations* [to] *substitute, supplement, or duplicate* any portion of the program as necessary to meet the requirements of this section." 10 C.F.R. § 73.56(a)(4) (emphasis added). Furthermore, § 73.56(e) provides that a licensee shall implement a review procedure and sets forth the minimum requirements such a procedure should include, one of which is "an opportunity for an objective review of the information on which the denial or revocation was based." *Id.* "The procedure *may* be an impartial and independent *internal management review,*" but the regulations do not require that it be as

such. *Id.* (emphasis added). Not only has the NRC not expressly precluded arbitration to be the appeal procedure, but the language in the regulation contemplates it. Therefore, the Court concludes that arbitration pursuant to a collective bargaining agreement is an acceptable means of complying with the appeal process requirement as specified in NRC regulation 10 C.F.R. § 73.56.

PSE & G cites *Department of Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), in support of the proposition that decisions about security clearances rest solely with the granting agency and that because the NRC delegated this power to individual licensees, authority to make site access determinations rests solely with PSE & G and are not reviewable as part of examining whether just cause existed for an employee's discharge. *See* Pl.'s Br. at 23. In *Egan,* the Supreme Court held that the grant or denial of a security clearance to a particular employee is a sensitive and inherently discretionary judgment call that is committed by law to the appropriate executive branch agency having the necessary expertise in protecting classified information. 484 U.S. at 529–30, 108 S.Ct. 818.

PSE & G also cites to cases that follow *Egan* when reviewing a denial of site access leading to a discharge of nuclear power plant employees. However, these cases are distinguishable. One case involved a disability discrimination action under the Rehabilitation Act of 1973. *See Mitchell v. Crowell,* 966 F.Supp. 1071 (N.D.Ala.1996). The other two cases concerned actions under the Americans with Disabilities Act ("ADA"). *See McDaniel v. AlliedSignal, Inc.,* 896 F.Supp. 1482 (W.D.Mo.1995); *McCoy v. Pennsylvania Power & Light Co.,* 933 F.Supp. 438 (M.D.Pa.1996). The issues in *McDaniel* and *McCoy* were very similar to each other and both actions were dismissed for failure to establish a *prima facie* case under the ADA. *Id.* Both courts held that a security clearance is a qualification for the job under the ADA; that it is an essential function of the job; and that the employers could not accommodate the essential function of maintaining a government security clearance. *See McDaniel,* 896 F.Supp. at 1491; *McCoy,* 933 F.Supp. at 443 ("[The company] could make no 'reasonable accommodation' that would have allowed plaintiff to remain in his former position and retain his security clearance without compromising its obligation imposed by NRC."); *see also Mitchell,* 966 F.Supp. at 1079 (holding that an employee was not "otherwise qualified" for position of public safety officer and that "this court is without authority ... to require defendant to allow plaintiff to remain in the position without a security clearance.").

Nevertheless, NRC regulation 10 C.F.R. § 73.56 is distinct in that it allows for an arbitration procedure provided in a collective bargaining agreement to be implemented as the required appeal process for revocation or denial of site access authorization. Therefore, these cases and the holding in *Egan* do not apply to the particular circumstances in this matter. Having established that the NRC regulations do not preclude site access issues from being arbitrated and that § 73.56 permits arbitration as an appeal process for revocation and denial of site access authorization, the Court will review whether the arbitration provision in the operative collective bargaining agreement covers revocation of or denial of site access authorization.

**B.  *DOES THE ARBITRATION PROVISION IN THE OPERATIVE CBA COVER SITE ACCESS AUTHORIZATION?***

The Supreme Court has set forth certain principles which govern the arbitrability of labor disputes. *See AT & T Tech.,* 475

U.S. at 648, 106 S.Ct. 1415 (referring to a series of cases known as the Steelworkers Trilogy: United *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and United *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). The first principle is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *Warrior & Gulf Navigation*, 363 U.S. at 583, 80 S.Ct. 1347). The second principle is that whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance is an issue for judicial determination. *See id.* at 649, 80 S.Ct. 1347 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). The third principle is that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.* at 649, 80 S.Ct. 1347.

In addition, if the collective bargaining agreement contains an arbitration clause, there is a presumption of arbitrability. *See id.* Arbitration should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* at 650 (citations omitted). Where a particular arbitration provision is a broad one, "in the absence of any express provision excluding a particular grievance from arbitration," the Court has held that "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.*

■ The Third Circuit Court of Appeals in *E.M. Diagnostic* articulated a three-part analysis to determine whether a particular labor dispute is subject to arbitration. *E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters*, 812 F.2d 91, 95 (3d Cir.1987). This analysis requires the court to inquire (1) whether the present dispute comes within the scope of the arbitration clause; (2) whether any other provision of the contract expressly excludes this kind of dispute from arbitration; and (3) whether there is any other "forceful evidence indicating that the parties intended such an exclusion." *Id.*

PSE & G asserts that the grievance/arbitration procedure under Article IX of the CBA "limits arbitrable issues to 'disputes or differences' about the 'provisions' of the CBA" and given this narrow arbitration clause "and the fact that no reference" to "site access" or to "unescorted access" issues is mentioned in the CBA, "it is clear that the Forte access grievance is not arbitrable." Pl.'s Br. at 6, 16. Local 94 contends that the language in the arbitration clause "lends itself to a very broad interpretation" and that "[n]onetheless, even in cases involving narrow arbitration clauses, or grievance subjects not covered by any particular clause of an agreement, the proper inquiry is whether the grievance is related to an interest protected by the collective bargaining agreement or whether there are any provisions, specific or otherwise, in the agreement relative to the issue in dispute." Def.'s Br. at 14 (referring to *E.M. Diagnostic*, 812 F.2d 91). PSE & G concedes that "employees who are discharged can arbitrate the termination of their employment," and that "Local 94 is entitled to arbitrate whether proper cause existed under the collective bargaining agreement for the discharge of Vincent Forte," but not with respect to *site access* determinations. Pl.'s Reply Br. at 4, Answer to Countercl. ¶ 19 (emphasis in

original). Local 94 counters that "adverse job actions resulting in discharge, such as the revocation of site access authorization," is a term and condition of employment protected under the CBA. Def.'s Br. at 13. Accordingly, Local 94 asserts that Mr. Forte had the option and/or the ability to challenge any adverse action that affected any term or condition of employment through the CBA grievance procedures. *See id.*

### 1. *Scope of the Arbitration Clause and Zone of Interests*

■ In *E.M. Diagnostic*, the collective bargaining agreement provided for arbitration of "any dispute arising out of a claimed violation of this Agreement." 812 F.2d at 95 (quoting collective bargaining agreement). The Court held that "a claimed contract violation comes within the scope of an arbitration clause of this character when the subject matter of the grievance is one that is within the zone of interests that have received protection in the collective bargaining agreement." *Id.*

In *E.M. Diagnostic*, the Company sought to enjoin arbitration of a grievance concerning its use of an outside contractor to perform certain work. 812 F.2d at 92. The Company argued that the collective bargaining agreement bestowed upon the Company the right to subcontract and "that there is no language in the agreement from which the Union's claim can be said to arise out of." *Id.* at 95. However, the court noted that the contract also limited the right to subcontract by providing that this right was "subject to restrictions contained in agreement." *Id.* The court held that even if limits on the right to subcontract were not explicitly declared, "an absolute right to subcontract would include the right to subcontract all work of the bargaining unit and would be inconsistent with the agreement's recognition of the Union as the bargaining agent for Company's employees." *Id.* at 96. The court further reviewed other provisions in the agreement that recognized the interests of Union members in their right to perform work free from competition of non-union personnel. *See id.* Based on these provisions, the court concluded that the subject matter of the grievance came within the zone of its protected interests under the collective bargaining agreement, therefore, the dispute arose out of a claimed violation of the agreement. *Id.; see also General Elec. Co. v. Teamsters Local Union No. 676,* 718 F.Supp. 400, 404 (D.N.J.1989) (where the court reviewed several provisions in the bargaining agreement concerning the subject matter of a union's grievance and found that the disputed issue came within the zone of union's protected interests under the agreement.).

### 2. *Whether the Zone of Interests Analysis Applies*

PSE & G argues that the zone of interests analysis does not apply to the present matter because 1) in contrast to the provision in *E.M. Diagnostic* where the agreement provided for arbitration of "any dispute arising out of a claimed violation of the agreement," the arbitration provision at issue in the present case is significantly narrower; and 2) the CBA between PSE & G and Local 94 provides solely for "rights" arbitration and interest disputes are not arbitrable under a "rights" arbitration clause. *See* Pl.'s Br. at 19–22.

PSE & G stresses that "any dispute arising out of a claimed violation of the agreement" is broader than the "narrower category of disputes, i.e. those about existing contract provisions," provided in the CBA between PSE & G and Local 94. Pl.'s Br. at 20. Therefore, according to PSE & G, a court's review of the CBA for any reference to the subject matter of the dispute and whether it is within the union's zone of interests that are protected in the

CBA is inappropriate. Furthermore, PSE & G asserts that Local 94 has failed to identify a provision in the CBA of which PSE & G allegedly violated; therefore, there is no dispute pertaining to the interpretation, application, or operation of any provision in the Agreement. *Id.* at 29.

However, a similar argument as the one PSE & G asserts was asserted by General Electric Company in *General Elec.*, 718 F.Supp. at 403. The court in *General Electric* found this argument to be unpersuasive because there did not "appear to be a significant difference in the character of the *E.M. Diagnostic* clause which provided for arbitration for 'any dispute arising out of a claimed violation of this Agreement' and the language of the clause at issue which provided for arbitration 'with respect to the interpretation or application of any provision of this Agreement.'" *Id.* The Court held that:

> Both clauses direct attention to the agreement, the first toward disputes arising from violations of the agreement, the second toward disputes with respect to "interpretation or application" of provisions of the agreement. GE's clause involves *interpretation* of provisions and the word interpretation connotes as flexible a character as the *E.M. Diagnostic* language of 'arising out of.' Thus, the zone of interest test is applicable.

*Id.* (emphasis in original). The language of the arbitration provision in *General Electric* is nearly identical to the language of the arbitration provision in the CBA between PSE & G and Local 94, which provides for arbitration of "any dispute or difference . . . as to the interpretation, application, or operation of any provision of this Agreement." The Court agrees with the court's reasoning in *General Electric* and finds that there is no critical difference in the language contained in the CBA agreed to by PSE & G and Local 94 and the arbitration provision at issue in *E.M.*

*Diagnostic.* Therefore, the Court concludes that the zone of interests test is applicable to the present matter.

PSE & G also cites to three Third Circuit cases to assert that in applying the zone of interest test, the Third Circuit has drawn a dichotomy between "rights" arbitration and "interest" arbitration, and that interest disputes are not arbitrable under a "rights" arbitration clause. Pl.'s Br. at 21–22 (citing *Pennsylvania Power Co. v. Local Union # 272*, 886 F.2d 46 (3d Cir. 1989); *Jersey Nurses Econ. Sec. Org. v. Roxbury Med. Group*, 868 F.2d 88 (3d Cir.1989); *Lodge 802 Int'l Bhd. of Boilmakers v. Pennsylvania Shipbuilders Co.*, 835 F.2d 1045 (3d Cir.1987)). PSE & G contends that the CBA between PSE & G and Local 94 provides solely for "rights" arbitration. *See id.* However, PSE & G's reliance on these cases is misplaced.

The Third Circuit Court of Appeals in these cases did not note the distinction between "rights" arbitration and "interest" arbitration in applying the zone of interest test, nor is the zone of interest analysis discussed. Instead, these cases involve separate provisions in collective bargaining agreements that specifically limited an arbitrator's ability to set new terms to the agreement. For example, in *Pennsylvania Power*, in deciding whether a grievance regarding a wage rate for a newly created job classification was arbitrable, the court reviewed a separate provision of the collective bargaining agreement which provided that "the arbitrator shall have no power to change, add to, or subtract from any of the provisions of this Agreement." *Id.* at 48. Noting that it had been called upon to examine the legal effect of similar language in *Lodge*, *supra*, and *Jersey Nurses*, *supra*, the court found that "such clauses limit the scope of arbitrable issues to those 'involving the interpretation or application of terms and conditions of em-

ployment that the parties have themselves agreed to in their contract.' " *Id.* (citations omitted). The court explained "we have distinguished such 'rights' arbitration from 'interest' arbitration, where the parties have agreed to allow the arbitrator to set new terms and conditions of employment that are not contained in the collective bargaining agreement." *Id.* The court further discussed that "when parties agree to 'rights' rather than 'interest' arbitration, the arbitrator exceeds her authority if she deems arbitrable those issues whose resolution calls for the addition of new terms or conditions to the agreement." *Id.* The court concluded that because the collective bargaining agreement did not contain a wage rate for the [newly created] position, the union, in seeking an arbitrator's ruling as to the appropriate wage rate for that position, "sought 'to have the arbitrator create new terms for the parties' " and because of the separate provision limiting arbitrable issues to terms and condition already agreed upon, the arbitrator did not have that power. *Id.* at 49.

Similarly, in *Lodge 802,* the union had sought to have an arbitrator fix the wage rates for a particular job classification. 835 F.2d 1045. The relevant agreement limited arbitration "to the meaning, application or interpretation of any of the terms or conditions of this Agreement." *Id.* at 1046. The collective bargaining agreement also contained a separate provision which provided that "the arbitrator shall not have power to alter or modify the terms and conditions of this Agreement." *Id.* The court distinguished the case from *E.M. Diagnostic* by explaining that the present "grievance is not one of 'a claimed contract violation'; instead the Union seeks to have the arbitrator create new terms for the parties." *Id.* at 1047.

In contrast with the agreement involved in these cases, there is no separate provision in the CBA agreed to by PSE & G

and Local 94 that specifically limits the arbitrator from changing, adding to, or subtracting any provision in the agreement or, in the alternative, one that specifically permits the arbitrator to set new terms and conditions of employment that are not contained in the agreement. The distinction between "rights" arbitration and "interests" arbitration does not apply without such a provision. Furthermore, unlike the aforementioned cases where the union asked the arbitrator to set wage rates or benefit categories (*see Jersey Nurses,* 868 F.2d at 89) which would create new terms in the collective bargaining agreement, Local 94 is not asking the arbitrator to create new terms for the parties. Instead, the Union is claiming that PSE & G is in violation of the CBA by revoking Mr. Forte's site access authorization and discharging him without proper cause. The arbitrator is not expected or requested to create new terms in the agreement, but rather, is to decide whether proper cause exists for discharging Mr. Forte. Whether the arbitrator is permitted to determine if proper cause existed for the revocation of site access is the issue before this Court, and whether site access determinations are within the zone of interests protected in the CBA is the appropriate inquiry in determining the issue. Finally, whether or not the zone of interests test applies to the instant matter is not determinative of the outcome of this case because the Court finds that the arbitration of site access decisions is not within Union's protected zone of interests under the CBA.

**3.  *Site Access Determinations are not within the Zone of the Union's Protected Interests under the Operative CBA.***

■ As compared with *E.M. Diagnostic,* where the court found that the subject matter of the grievance was within the zone of interests, the Court does not find

that to be the situation in the present matter. Whereas in *E.M. Diagnostic,* the collective bargaining agreement provided that the right to subcontract was subject to restrictions and the court reviewed other provisions which recognized the rights of union members to perform work free from competition of non-union personnel, there is no mention of site access authorization issues in the CBA agreed to by PSE & G and Local 94. There are no provisions, specific or otherwise, related to site access authorization determinations. In fact, during the deposition of John Gerrity, President of Local 94, Mr. Gerrity agreed that the "the body of the contract, says nothing about site access." Def.'s Ex. 10 at 39, App. 3, Gerrity Dep. Upon furthering questioning, Mr. Gerrity explained that site access questions should be both grieved and arbitrated because it has been established as past practice. *See id.* at 39– 42.

Local 94 in its brief refers to certain letters attached to and incorporated into the CBA to demonstrate that PSE & G has agreed to be bound by terms and conditions of employment outside the actual wording of the contract, *i.e.* past practice. Asserting that past practice has been incorporated into the CBA, Local 94 specifically refers to the May 2, 1961 letter that states, "the intent of the existing provisions and the long-time interpretation and practice do not limit Company representation at second and third-step grievance meetings as a literal interpretation of the wording might indicate." Def.'s Ex. 4 at A4, App. 1. Local 94 contends that this demonstrates that PSEG acknowledged its acceptance of a long-time practice and interpretation of the wording in the contract concerning grievance procedures. However, this provision specifically refers to discussions concerning the revision to Sections C and D under Article IX of the CBA, which both parties agreed was not necessary based on the understanding that

long-standing practices would continue. *See id.* Sections C and D of Article IX refer to the steps in the procedure for how disputes or differences should be settled. No revisions were discussed or long-standing practices accepted concerning Section A, which delineates the substantive issues (disputes and differences) to be resolved pursuant to the procedure set forth in Sections B through F. *See id.* The Court finds this letter unpersuasive because it is the subject matter for arbitration that is at issue in the present matter.

Local 94 refers to other letters incorporated into the CBA as well. *See* Def.'s Br. at 12. The May 1, 1977 and May 1, 1987 letters reflect the agreement between the parties to refer to the language in the source document if a question arises over the interpretation, application or operation of "certain Personnel Instructions and Letters to the System Council" incorporated into the CBA. Def.'s Ex. 4 at A10 and A26, App. 1. The Court finds these letters unconvincing in that they fail to support the Union's assertion that PSE & G agreed to be bound by past practice or any terms and conditions regarding site access authorization issues outside the wording of the contract.

Furthermore, a past practice must be clearly enunciated and consistent, endure over a reasonable length of time, and be an accepted practice by both parties. *See Posadas de Puerto Rico Assoc., Inc. v. NLRB,* 243 F.3d 87, 92 (1st Cir.2001) (stating that "[a]n item that is not addressed in a collective bargaining agreement can become a term and condition of employment ... if it has been 'satisfactorily established' by past practice or custom."); *but see Lukens Steel Co. v. United Steelworkers of Am.,* 989 F.2d 668, 673 (3d Cir.1993) (stating that "[i]f the agreement is explicit and unambiguous [regarding whether a grievance is arbitrable]; there is no need

to look to extrinsic evidence."). Local 94 asserts that "the resolution of site access disputes by way of arbitration has been the established practice between the parties for nearly two decades." Def.'s Br. at 11. Local 94 offers the Affidavit of John Gerrity, President of Local 94, as providing a historical factual basis for the Union's conclusion that PSE & G has consented to the resolution of site access disputes through the grievance and arbitration provisions in the CBA. *See* Def.'s Ex. 11, App. 3, Gerrity Aff.

In his Affidavit, Mr. Gerrity refers to five disputes that were submitted to arbitration, four of which occurred in the 1980s, prior to the promulgation of the NRC regulation at issue, and one in 1993. The Court has reviewed Mr. Gerrity's Affidavit and the accompanying settlement agreements, arbitration awards, and arbitration hearing transcripts, Def.'s Ex. 19–24, App. 4, and concludes that these matters do not demonstrate a past practice that is clearly enunciated, consistent, and accepted as a course of conduct by both parties with respect to site access. For example, in 1983, an employee who was accused of misrepresenting his criminal history on his employment application was suspended from "vital access" to restricted areas of the facility. Def.'s Ex. 20, App. 4, Opinion and Award of Arbitration Board. Several days thereafter, he was suspended from work pending the outcome of an investigation. *Id.* About one month later, the employee was discharged based on his falsification of the application. *Id.* The Union filed a grievance protesting the discharge; subsequently, the matter was submitted to arbitration. *Id.* Notably, the issue before the Board of Arbitration was whether the employee falsified information on his employment application, and if so, whether such conduct constituted proper cause for his termination. *Id.* The Board found that the discharge was for proper and just cause and not in violation of the

CBA. *Id.* Importantly, the issue before the Board was not whether there was proper cause to revoke the employee's site access and there is no discussion of site access issues in the Board's Opinion.

In another matter, the issue submitted to arbitration was whether the discontinuance of employment of the grievant was for proper cause. Def.'s Ex. 20, App. 4, Arbitration Opinion and Award. There is no discussion of site access issues in the Board's opinion, nor would such a discussion have been relevant in the matter because the employee was not denied site access. *Id.* In addition, Mr. Gerrity refers to another dispute submitted to arbitration that was settled pursuant to an informal settlement agreement before an arbitration award was issued. Def.'s Ex 11, App. 3, Gerrity Aff. Interestingly, as Mr. Gerrity discusses in his Affidavit, PSE & G argued during the arbitration hearing that the proper issue before the Arbitration Board was whether the Company had a right to discontinue the employee once the determination was made that he was unsuited for site clearance. Def.'s Ex. 22, App. 4. The Union disagreed and argued that it was one of the issues to be resolved by the Board. *Id.* Far from evidence that PSE & G accepted arbitration of site access issues, this demonstrates that PSE & G actually disputed submission of site access issues to arbitration. In the fourth matter, once again, the issue submitted to arbitration was whether the employee was discharged for proper cause and once again, there is no discussion of site access issues in the Arbitration Board's opinion. Def.'s Ex. 23, App. 4.

In the fifth dispute Gerrity refers to in his Affidavit, which occurred after implementation of the relevant NRC regulation, PSE & G filed an action for a declaratory judgment barring the issue of denial and revocation of site access from arbitration.

Def.'s Ex. 24, App. 4. The action was withdrawn without resolution by the court and the parties settled the dispute. *Id.* A clause in the Settlement Agreement reads that "[i]t is the position of Public Service that site access determination issues are not arbitrable, and it is the position of [the Union] that they are arbitrable under the parties agreement." Def.'s Ex. 24, App. 4, Settlement Agreement. Once again, this demonstrates that PSE & G had not accepted arbitration as a means of resolving site access disputes.

The Court concludes that the resolution of site access disputes by way of arbitration is not a past practice incorporated into the CBA, and thus, is not within the zone of interests protected in the operative CBA. The matters Local 94 has identified for supporting this assertion fail to demonstrate a clearly enunciated and consistent practice over a reasonable length of time that has been an accepted course of conduct by both parties. Because the Court has determined that site access disputes do not come within the scope of the arbitration clause it is not necessary to inquire whether there is any other provision excluding this kind of dispute from arbitration or whether there is other "forceful evidence" indicating that the parties intended such an exclusion under *E.M. Diagnostic.*

The Court recognizes the interests of union members in their right to arbitrate whether proper cause exists for decisions affecting the terms and conditions of their employment. As admitted by PSE & G, whether proper cause existed for Mr. Forte's termination is subject to arbitration pursuant to the CBA. However, revocation of Mr. Forte's access authorization is a separate determination that is made pursuant to NRC regulations that require licensees, here PSE & G, to implement an access authorization program and an appeal procedure for denial or revocation of

site access authorization. *See* 10 C.F.R. § 73.56. Though the appeal procedure may be a grievance/arbitration process provided in a collective bargaining agreement, it is also important to note that in light of the first principle governing the arbitrability of labor disputes, arbitration is a matter of contract and PSE & G is only required to submit to arbitration those disputes it has agreed to submit. *See AT & T Tech.,* 475 U.S. at 648, 106 S.Ct. 1415. PSE & G has neither expressly or implicitly agreed to submit site access disputes to arbitration, nor has the Company assented that arbitration, as set forth in the CBA, is the appeal process for revocation of access authorization decisions pursuant to NRC regulation § 73.56.

Though there is a presumption of arbitrability when a CBA contains a broad arbitration clause, not every issue is subject to arbitration. *See E.M. Diagnostic,* 812 F.2d at 95. Not only does the Court conclude that site access issues are not within the zone of the Union's protected interests under the current and operative CBA, but in the instant matter which concerns the unique and critical issue of the safety of the public at large regarding nuclear power plants, the Court deems it necessary and appropriate that both PSE & G and Local 94 expressly agree to submit site access issues to arbitration and that this be specifically provided in the CBA.

Furthermore, denying arbitration of Mr. Forte's revocation of site access authorization without a specific provision in the CBA does not infringe on the rights of the Union to grieve and arbitrate whether proper cause exists for his termination. As PSE & G asserts, if Local 94 prevails on behalf of Mr. Forte, and the arbitrator finds that proper cause does not exist for Forte's discharge, then the arbitrator could award, for example, reinstatement

with full back pay for Forte. The only remedy not available would be granting site access. Finally, arbitration may be available for union members in the future, provided that labor and management negotiate this issue and specifically articulate in the CBA that arbitration is the appeal procedure for revocation or denial of site access authorization.

## C. DOES PUBLIC POLICY PERMIT ARBITRATION SPECIFICALLY PROVIDED FOR IN A CBA AS AN APPEAL PROCESS FOR SITE ACCESS DETERMINATIONS?

■ Other courts have recognized the significance of the regulatory scheme governing nuclear energy in ensuring public safety. The court in *International Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power* maintained that "[c]ongressional authorization for a specific agency, the Nuclear Regulatory Commission, to oversee and ensure nuclear safety, reflects the 'level of public concern over the safety of the nuclear power industry.'" 143 F.3d 704, 718 (2d Cir.1998) (citation omitted). The NRC regulations represent "a strict regulatory scheme devised by Congress for the protection of the public from the hazards of nuclear radiation" demonstrating "a dominant and well-defined policy requiring strict adherence to nuclear safety rules." *Id.* (citations omitted); *Tennessee Valley Auth. v. Tennessee Valley Trades and Labor Council,* 184 F.3d 510, 519 (6th Cir.1999). Courts have also acknowledged the licensee's required compliance with the extensive regulations promulgated by the NRC designed to ensure the safety of nuclear power plant workforces and the public at large. *Id.* at 707. In addition, "[a] court may not enforce a collective bargaining agreement that is contrary to public policy" and the "question of public policy is ultimately one for resolution by the courts." *Id.* at 715 (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983))

Several cases have involved claims that a labor arbitration award should not be enforced because it contravened public policy or that the arbitrator exceeded his or her authority to resolve issues that affected public safety and well being subject to government regulation, i.e. nuclear safety regulations. *See id.; Local 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power,* 196 F.3d 117 (2d Cir.1999); *Tennessee Valley Auth.,* 184 F.3d 510 (6th Cir.1999). The issue in these cases was the public policy implications of reinstating employees to safety-sensitive positions. Basically, at bottom, this is the same issue that PSE & G is concerned about here. These cases also reflect that site access issues have been submitted to arbitration pursuant to collective bargaining agreements, however, there is no detailed discussion regarding the specific arbitration provisions.

The NRC regulation at issue in *International Bhd. of Elec. Workers, Local 97* required the licensee to maintain a Fitness for Duty program which entailed random drug testing.[2] 143 F.3d at 707. The case involved a chemistry technician, responsible for ensuring that the plant chemistry was maintained within the technical specifications required by the NRC, who adulterated his specimen with chlorine during the administration of a random drug test. *Id.* After a second test confirmed the presence of cocaine, a disciplinary hearing was

---

**2.** It should be noted that, initially, the Company unilaterally implemented the Fitness for Duty program. However, importantly, it was

superceded when the Company and the Union reached an agreement and created a new program. *Id.* at 709.

held pursuant to a provision in the collective bargaining agreement which required that a fact-reviewing meeting be convened prior to the imposition of any discipline involving the loss of pay. *Id.* at 707–08. Subsequent to the hearing, the Company terminated the employee. *Id.* at 708. The union appealed the termination through the grievance procedure pursuant to the collective bargaining agreement and the matter was ultimately submitted to arbitration. *Id.* The issue submitted was whether the Company had "just cause" for the discharge. *Id.* The arbitration panel ordered that the employee be conditionally reinstated and the District Court vacated the award holding that reinstatement would contravene public policy favoring a safe work environment. *Id.* at 709.

The Second Circuit Court of Appeals reversed the District Court and held, in part, that the arbitration award of the employee's conditional reinstatement didn't violate public policy. *Id.* at 719. The court found that the NRC regulations did not proscribe reinstatement of employees found to have adulterated a drug test or who have tested positive for drugs or alcohol. *Id.* at 718. Specifically, the regulations did not discuss or specify any penalty for the adulterated drug test offense, and that the regulations only required a minimum two week denial of unescorted access and referral to an employee assistance program when employees tested positive. *Id.* at 718 (referring to 10 C.F.R. § 26.27). The court further found that the NRC regulation "clearly contemplates the notion of both rehabilitation and reinstatement." *Id.* Therefore, the court held that nothing in the NRC regulations prohibited re-employment of the employee provided that adequate assurance of the employees's rehabilitation is obtained. *Id.* at 719.

In dicta, the court sympathized that in a nuclear work environment, the protection of the public must take precedence for which there is little room for error, and dismissal from employment ought to be a viable alternative for the offenses. *Id.* at 727. However, the court recognized the problem as two-fold. The Company had agreed to a Fitness of Duty Program that did not provide it with sufficient authority to discharge an employee for that particular offense, and second, the NRC, "the policy maker here, [had] chosen not to confront the issue directly." *Id.*

In *Tennessee Valley Auth.*, when a nuclear reactor unit operator tested positive during a random drug test administered pursuant to the Company's Fitness for Duty Program, his security clearance was suspended. 184 F.3d at 512. Thereafter, the employee unsuccessfully attempted to understand and comply with instructions concerning his responsibilities and rights in appealing the denial of his security clearance. *Id.* Eventually, the company terminated him for failure to maintain his security clearance. *Id.* at 513. Pursuant to the collective bargaining agreement entitled the General Agreement, the union filed a grievance alleging that the employee had been "treated unfairly" by the Company. *Id.*

The arbitrator awarded reinstatement surmising that the employee's termination was unjustified because he was not afforded due process to which he was entitled pursuant to the collective bargaining agreement and Company policy and procedure based on the appropriate laws and NRC regulations. *Id.* at 514. The District Court vacated the arbitrator's award holding in part that it was at variance with another contract between the parties (the Framework Agreement) and was contrary to public policy. *Id.* However, the Court of Appeals held that the "enforcement of the award did not violate any public policy." *Id.* at 521.

The court reviewed the General Agreement which in express terms, provided a grievance procedure "to resolve an employee's complaints about having been 'treated unfairly'" and explicitly reserved the resolution of the issue to the arbitrator as well as disagreements with supervisors regarding the application of employment policy. *Id.* at 516. The court also considered the Framework Agreement which specifically provided that unless expressly modified or restricted by another provision, management, Tennessee Valley Authority ("TVA"), retains the right "to determine its internal security practices; to suspend, discharge employees... for cause." *Id.* (quoting Agreement). The Agreement also designated management responsibilities as being "matters governed by federal law, including regulations," but parenthetically qualified this clause by providing "to the extent that the law provides flexibility in its implementation, such matters are within the scope of bargaining unless otherwise excluded by this Agreement." *Id.* at 517. The Agreement further designated as management responsibilities, "the program for determining fitness for duty; [and] ... development of health and safety rules and requirements." *Id.*

The court concluded that based on this Framework Agreement, determinations of fitness of duty were not within the scope of bargaining, but that this did not "restrict any right that the [union] would otherwise have to challenge actions on matters which go beyond the requirements of federal law." *Id.* at 518 (quoting Agreement). Therefore, because the issue before the arbitrator was whether the Company had treated the employee unfairly, the arbitrator was allowed to consider pursuant to the General Agreement, whether the determination to remove his security clearances was conducted fairly. *Id.*

The court further held that the arbitrator's decision was not contrary to federal law or regulation nor was the reinstatement award violative of public policy. *Id.* at 518–20. However, the court qualified this holding by explaining that if the award were interpreted as requiring TVA to reinstate the employee's security clearance without any further proceedings, the question of whether it violated public policy would be more difficult. *Id.* In addition, the court explained that such an award would more likely "exceed the arbitrator's authority under the General Agreement, which does not authorize an arbitrator to dictate a substantive outcome of a fitness determination nor the manner in which the company weighs the various considerations relevant to that decision." *Id.* at 520.

In the present case, the question is whether arbitration of a labor-management dispute pursuant to a collective bargaining agreement is violative of public policy, not whether the award itself is violative of public policy. The relevant NRC regulation requires a procedural appeal process when licensees deny or revoke security clearances and the issue is whether arbitration pursuant to this collective bargaining agreement may be the appeal process. PSE & G's concern appears to be the usurping of its authority to make site access decisions by the arbitrator if arbitration is designated as the site access appeal process. However, as the Court has already determined, the NRC regulations permit arbitration to be the appeal process for revocation or denial of site access decisions. Similar to the General Agreement in *Tennessee Valley Auth.*, the CBA agreed to by PSE & G and Local 94 does not authorize an arbitrator to rule on site access determinations. This having been established, the Court believes that as a matter of public policy, including the profound safety concerns regarding the nuclear energy industry, an appeal proce-

dure for site access determinations is worthy of a clear and specific reference in either the CBA or the PAP.

Therefore, the Court holds that due to public policy reasons, including the critical importance of security measures implemented by nuclear power plants in accordance with the law and NRC regulations to ensure public safety, and in acknowledgment of the public interest in resolving labor disputes in the least obstructive manner by encouraging arbitration and protecting the rights and interests of labor, site access appeals must be a specifically agreed upon procedure by both labor and management. The importance of site access determinations warrants a separate, clear and specific provision in the collective bargaining agreement if arbitration is to be the review process. In the present case, the Court has found that there is no specific provision in the operative CBA between PSE & G and Local 94 allowing for arbitration as an appeal procedure of site access determinations. Absent such a provision in the CBA, the current management review process in PSE & G's Personnel Access Program is the only available means for appealing decisions revoking or denying site access authorization.

In sum, public policy does not preclude arbitration from being implemented as the appeal procedure for site access determination, however, it does require a clearly enunciated provision in the CBA that designates arbitration as the appeal procedure for site access determinations.

### D. *DOES THE PSE & G PERSONNEL ACCESS PROGRAM VIOLATE NRC REGULATIONS?*

Finally, Local 94 argues that the PSE & G Personnel Access Program violates NRC regulations. As previously mentioned, NRC regulation 10 C.F.R. § 73.56 sets forth certain required minimum standards to be included in the appeal proce-

dure for site access decisions. The site access appeals program must provide that the employee is informed of the grounds for the denial or revocation of site access authorization; that he or she is allowed an opportunity to provide additional relevant information; and that he or she is provided an opportunity for an "objective review of the information on which the denial or revocation was based." 10 C.F.R. § 73.56(e). Furthermore, the regulation provides that "[t]he procedure may be an impartial and independent internal management review." *Id.*

After reviewing the appeal procedure set forth in PSE & G's Personal Access Program, the Court finds that the program complies with § 73.56(e). Pursuant to the PAP, when a background investigation discloses adverse information concerning an employee, the Access Authorization Supervisor is responsible for deciding whether to deny personnel access clearance using her own expertise referring to criteria for denying access listed in Appendix A of the PAP manual, "and any other available regulatory or industry guidance." Pl.'s Ex. K at 36–37, PSE & G Personnel Access Program Section 7.4. As part of the program, a Site Access Committee is established as well, "to provide guidance and aid in the decision-making process when multi-department issues are present." *Id.* The Committee members include the "Access Authorization Supervisor, Manager–Nuclear Security, Psychological Services Administrator, Medical Review Officer, the subject's R/C Manager and/or Employee Relations management representative, as appropriate to the case." *Id.*

An employee may appeal a denial or revocation of site access decision "provided the person has a reasonable basis upon which to believe the decision was in-

correct." *Id.* at 8.0. "Disagreement with written company policy or requirements in federal or state regulations is not an acceptable reason for an appeal." *Id.* at 8.1. The employee must submit a written request for an appeal to the Access Authorization Supervisor, a copy of which is sent to the Employee Relations Manager, stating the reasons he or she believes the denial or revocation of access decision was incorrect. *See id.* The Access Authorization Supervisor reviews the appeal request and forwards it to the Appeals Officer "responsible for conducting the impartial review of Personnel Access Clearance denial decisions" and any additional information germane to the case. *See id.* The Appeals Officer then reviews the employee's "access processing files and may conduct or have conducted additional inquiries as necessary to achieve an independent evaluation of the available facts." *Id.* at 8.3. During this independent evaluation, the program requires the Appeals Officer to review 1) information provided by the employee at the time of the original adverse information interview or in the appeal request; 2) documentation received by the employee which provided notification of the access denial; 3) other relevant communications such as notes of oral discussions and interviews; and 4) the department's documented process used to affect the decision; *i.e.* departmental implementing procedures. *Id.* The Appeals Officer will either affirm the decision or recommend reversal. If reversal of the decision is recommended, the Access Authorization Supervisor has the opportunity to concur. *Id.* If the Supervisor does not concur, the recommendation of reversal is submitted to the Manager of Nuclear Security. *See id.* at 8.3, Actions by the Appeals Officer.

After his third arrest for DUI in August 1997, PSE & G suspended Mr. Forte's site access authorization. PSE & G found temporary work for Mr. Forte that did not require site access. However, in November 1997, after Mr. Forte's conviction of the DUI charge and the forfeiture of his drivers' license to the State of New Jersey, PSE & G indefinitely suspended Forte's site access privileges. In a letter dated April 9, 1998, Ronald Fisher, Site Access Screening Supervisor, informed Mr. Forte that the "Site Access Committee re-convened pursuant to a request by PSE & G management to reconsider the matter of [his] unescorted access." However, the Committee concluded that the decision to deny access authorization was appropriate. Pl.'s Ex. H. Mr. Fisher further advised Mr. Forte that he had the right to appeal the access decision within 10 days. *Id.* Mr. Forte failed to avail himself of the appeal process offered by PSE & G as part of their PAP in compliance with the NRC regulations.

■ Local 94 does not contend that the procedure was not followed in Mr. Forte's case or that it was arbitrarily or unfairly imposed in his case. Instead, Local 94 alleges that the PSE & G Personnel Access Program violates NRC regulation 10 C.F.R. § 73.56 in that, in general, it is unfairly and arbitrarily implemented against PSE & G employees. *See* Def.'s Br. at 21. The Union alleges that too much power is vested in individual management personnel who decide the fate of employees without adequate guidelines to operate as a check on their conduct and discretion. *Id.* at 22. Local 94 points to the Affidavit of Ronald K. Fisher and asserts that even Mr. Fisher admits that "the Access Committee is 'self-managed' and collectively answerable only to the Manager of Nuclear Security, himself a member of the Committee." *Id.* at 23; Def.'s Ex. 6 at 94–96, App. 2, Fisher Dep. Local 94 also refers to John Gerrity's Affidavit, wherein Mr. Gerrity describes how security personnel have used site access as

a basis to "intimidate, control, and harass employees at their whim." *Id.* at 24–25. For example, security personnel have suspended access authorization to employees who park in the wrong spot in the parking lot. Def.'s Ex. 11, App. 3, Gerrity Affidavit.

█ Nevertheless, there is no private cause of action for violations of the provisions of the Atomic Energy Act. *See Brown v. Northeast Nuclear Energy Co.,* 48 F.Supp.2d 116, 121–22 (D.Conn.1999) (stating that there is no private cause of action "in light of Congress' express prohibition against private enforcement of the Atomic Enforcement Act in 42 U.S.C. § 2271(c), which provides: 'No action shall be brought against any individual or person for any violation under this chapter ... except by the Attorney General of United States ....' "); *see also Conway v. PECO Energy, Co.,* No. CIV.A.96–7284, 1997 WL 34672, at *5 (E.D.Pa. Jan. 28, 1997). The NRC regulations do provide "private parties with a limited administrative enforcement mechanism for alleged violations, 10 C.F.R. § 2.206 (any person may request the NRC to institute a proceeding to modify, suspend or revoke a license) and vests civil and criminal enforcement authority in the NRC under 42 U.S.C. § 2271(c))." *Brown,* 48 F.Supp.2d at 122. In *Conway* the plaintiff alleged that the company's conduct in investigating his alleged drug activity and revoking his security clearance violated various NRC regulations. 1997 WL 34672, at *5. The court in *Conway* declared that "[i]t is clear ... that Congress did not intend the federal courts to be available to hear cases by a plaintiff for violation of NRC regulations of drug testing and security clearance investigations," and held that the court lacked jurisdiction over such matters. *Id.*

Similar to *Conway,* Local 94 claims PSE & G's conduct violates NRC violations by its unfair and arbitrary implementation of the Personnel Access Program. Therefore, if the Union believes that the Personnel Access Program is in violation of the NRC regulations in that it is arbitrarily implemented by PSE & G, it may appeal to the NRC pursuant to § 2.206.

## IV. CONCLUSION

For the reasons set forth herein, Plaintiff's motion for summary judgment requesting the Court to declare that site access issues are not subject to arbitration under the grievance/arbitration provision of the CBA is granted. Defendant's cross-motion for summary judgment requesting the Court to order Plaintiff to submit to arbitration the issue of the revocation of site access for Vincent Forte is denied. Defendant's cross-motion for summary judgment requesting the Court to order Plaintiff to submit to arbitration the issue of revocation of site access for all other Local 94 represented employees whose employment may be adversely affected is denied without prejudice, subject to a new provision in the CBA specifically providing for arbitration as the appeal process for site access determinations.

Requiring a specific provision in the CBA presents a legally permissible opportunity for labor and management to come together to agree on a clear and precise method of site access review, compliant with NRC regulations, which would result in a fair and reasonable balance between the rights of union members and the safety of the public. Absent such a specific provision, the current appeal procedure as set forth in PSE & G's Personnel Access Program complies with NRC regulations and is the applicable method of review.