## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 11-2423

EXELON GENERATION COMPANY, LLC,

*Plaintiff/Counter-Defendant-Appellee,*

*v.*

LOCAL 15, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO,

*Defendant/Counter-Plaintiff-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-4846—**Robert W. Gettleman**, *Judge.*

ARGUED JANUARY 19, 2012—DECIDED MARCH 29, 2012

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* To work at one of the nation's privately-owned nuclear power plants, many employees must receive a security clearance with "unescorted access" privileges. When such access is denied or revoked, the Nuclear Regulatory Commission requires owner-licensees of nuclear facilities to provide the ag-

grieved worker with a review procedure. For plants whose employees are unionized, a longstanding issue has been whether labor arbitrators deciding grievances under collective bargaining agreements can review access denial decisions and order unescorted access as a remedy for a wrongful denial. From 1991 to 2009, the Commission took the unequivocal position that labor arbitrators have that power, and courts agreed.

In 2009, the Commission completed a comprehensive post-9/11 overhaul of nuclear power plant security requirements. Although it modified some of the regulatory provisions dealing with review of unescorted access denials, the new language was at best ambiguous as to whether the Commission had changed its policy to prohibit arbitral review. A close look at the text and the rulemaking record shows that it did not. Among other factors we consider, neither the Commission nor any other participant suggested in the notice-and-comment process that the new language would modify, let alone overturn, the Commission's established policy permitting arbitral review.

Nevertheless, plaintiff-appellee Exelon Generation Company maintains that the amended regulation quietly overruled the Commission's prior position. In the district court, Exelon sought and won a declaratory judgment that the 2009 amendments prohibit arbitration of access denial decisions. *Exelon Generation Co. v. Local 15, Int'l B'hood of Elec. Workers*, No. 10 C 4846, 2011 WL 2149624 (N.D. Ill. May 25, 2011). We reverse. The Commission did not flip-flop on an important, longstanding, and

controversial policy without clearly indicating either in the text of the rule or at any point in the rulemaking history that it was doing so.

I. *Factual and Regulatory Background*

Pursuant to its statutory mandate under the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, the Commission requires all licensees operating nuclear generators to implement access authorization programs in their facilities. 10 C.F.R. § 73.56(a). Licensees' programs must provide "high assurance" that individuals with unescorted access privileges "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security." 10 C.F.R. § 73.56(c). The Commission first promulgated these regulations in 1991 and amended them in 2009, each time via the notice-and-comment rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 553.

Two separate provisions of section 73.56 are disputed here. The first is paragraph (a)(4), which allows a "contractor or vendor" of the licensee "to satisfy appropriate elements of the licensee's access authorization program." 10 C.F.R. § 73.56(a)(4). Although it allows licensees to delegate some responsibilities over access programs to contractors and vendors, the provision also says: "Only a licensee shall grant an individual unescorted access." The second is subsection (*l*), which specifically addresses the review procedures that licensees must provide to employees whose unescorted access privileges

are denied or revoked.[1] The rule requires the licensee to give the aggrieved employee notice of "the grounds for the denial," "an opportunity to provide additional relevant information," and "an opportunity for an objective review of the information upon which the denial . . . was based." 10 C.F.R. § 73.56(*l*). The new 2009 version of subsection (*l*) also states: "The procedure must provide for an impartial and independent internal management review." *Id*. The 1991 version had provided: "The procedure *may be* an impartial and independent internal management review." 56 Fed. Reg. 18997, 19008 (emphasis added).

In May 2009, after the Commission issued the final amended regulation, a private consortium of nuclear power operators called the Nuclear Energy Institute (NEI) updated a set of "standard industry criteria" for implementing the amended regulation. The document, called "NEI 03-01 (Revision 3)," asserted: "the licensee internal management review process is final, shall be the exclusive means by which [unescorted access] decisions may be reviewed, and may not be reviewed or overturned by any third party." App. 58. In July 2009 the Commission staff reviewed NEI 03-01 (Revision 3) in "Regulatory Guide 5.66." The staff found NEI 03-01 (Revision 3) to "meet the intent and substance of" the amended access regulations. App. 382. Regulatory

---

[1]  The 1991 version of this "Review procedures" provision was codified as subsection 73.56(e), while the current version is subsection 73.56(*l*). For simplicity we refer to both versions as "subsection (*l*)."

Guide 5.66 stated that the "NRC staff considers conformance with the provisions of NEI 03-01 to be an acceptable approach to meet the requirements of 10 C.F.R. § 73.56." App. 385. The guide also cautioned: "Regulatory guides are not substitutes for regulations and compliance with them is not required." App. 383.

Plaintiff Exelon is a licensee that owns and operates nuclear generating facilities in Pennsylvania, New Jersey, and Illinois. IBEW Local Union 15 ("Local 15") represents 1,600 employees at Exelon's six Illinois plants. Since at least 2001, Exelon and Local 15's collective bargaining agreements have provided for a grievance procedure culminating in arbitration with respect to "any dispute" over "working conditions." App. 126. Pursuant to the access regulations, Exelon maintains a program for granting and denying current and prospective employees unescorted access privileges in its facilities. Exelon did not collectively bargain with Local 15 over its unescorted access program. In an earlier lawsuit between these parties, however, District Judge Lefkow ruled that access denials were grievable under the collective bargaining agreement and that the 1991 access regulations then in force did not preclude arbitral review. *Exelon Generation Co. v. Local 15, Int'l B'hood of Elec. Workers*, No. 06 CV 6961, 2008 WL 4442608 (N.D. Ill. Sept. 29, 2008). There was no appeal, and Exelon does not challenge either holding here.

Instead, Exelon filed a new action in the district court (assigned to Judge Gettleman) seeking a declaratory judgment that the 2009 amendments to the access reg-

ulations changed the Commission's policy to prohibit third-party review of a licensee's denial of unescorted access. The case was prompted by Exelon's termination of the unescorted access privileges and employment of several Local 15 members. Local 15 counterclaimed to compel arbitration of those decisions. On cross-motions for summary judgment, the district court found for Exelon.

## II. *Discussion*

We review *de novo* the district court's resolution of cross-motions for summary judgment. *E.g.*, *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011). This case involves a single question of federal law: whether the 2009 amendments to section 73.56 prohibit arbitration of unescorted access denials and revocations. The same rules of construction apply to administrative rules as to statutes. *E.g.*, *Alabama Tissue Ctr. v. Sullivan*, 975 F.2d 373, 379 (7th Cir. 1992). In either case, we begin by asking "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 710 (7th Cir. 2005), quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). A regulation is "ambiguous" as applied to a particular dispute or circumstance when more than one interpretation is "plausible" and "the text alone does not permit a more definitive reading." *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011). If the meaning of the regulatory text is clear, the task is complete. See *Christensen v. Harris County*, 529 U.S. 576,

588 (2000). When it is ambiguous, however, it is necessary to resort to other interpretive methods, such as analysis of the rulemaking record. See, *e.g., Wyeth v. Levine*, 555 U.S. 555, 570-*73,* 576-81 (2009) (analyzing rulemaking history to determine a regulation's preemptive scope). Where an agency has authoritatively interpreted its own rule, courts generally defer to that reading unless it is "plainly erroneous or inconsistent with the regulation." *E.g., Auer v. Robbins*, 519 U.S. 452, 461 (1997).

A. *Subsection (l)*

We begin with subsection (*l*) because that provision deals directly with review of unescorted access denials. It is plain that the text does *not* prohibit arbitral review:

> Review procedures. Each licensee and applicant shall include a procedure for the notification of individuals who are denied unescorted access . . . . Additionally, procedures must include provisions for the review, at the request of the affected individual, of a denial . . . of unescorted access . . . that may adversely affect employment. The procedure must contain a provision to ensure the individual is informed of the grounds for the denial . . . and allow the individual an opportunity to provide additional relevant information and an opportunity for an objective review of the information upon which the denial . . . was based. *The procedure must provide for an impartial and independent internal management review.*

10 C.F.R. § 73.56(*l*) (emphasis added). Exelon argues, and the district court found, that because the italicized sentence replaced the 1991 regulation's "may be" with "must provide," (1) internal management review is mandatory instead of optional, and (2) internal management review is the *only* permissible form of review.

The first conclusion is obvious. Subsection (*l*) expressly says that a licensee "must provide for an impartial and independent internal management review." The word "may" is precatory and "customarily connotes discretion," *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005), while "must," like "shall," is mandatory and generally forecloses discretion. *E.g.*, *Mallard v. U.S. District Court*, 490 U.S. 296, 301-02 (1989).

The second conclusion is mistaken. The inference that the requirement of an internal management review means that *only* this form of review is permitted rests implicitly on the much-derided maxim of *expressio unius est exclusio alterius* — the expression of one thing suggests the exclusion of others. For two reasons, this beleaguered canon does not apply here. First, "*expressio unius* . . . has reduced force in the context of interpreting agency administered regulations." *Whetsel v. Network Property Services, LLC*, 246 F.3d 897, 902 (7th Cir. 2001); see also *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990) (calling *expressio unius* "an especially feeble helper in an administrative setting"). Second, and more specifically, "the canon . . . has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not

mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003), quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002). Here, nothing in the text suggests that subsection (*l*)'s requirement of "an impartial and independent internal management review" is exhaustive. Quite the opposite, the wording — requiring licensees to "provide for" an internal review — indicates that the internal management review is inclusive rather than exclusive. The original 1991 version stated that the review procedure "may be" an internal management review. The 2009 switch to "must provide" (as opposed, for instance, to "must be" or "must constitute") implies that while an internal management review must be among the procedures provided, the licensee may also provide others. Nothing in the language suggests the opposite view.

Exelon's reading of section 73.56 mistakenly assumes that the Commission wrote the 2009 revision to roll back workers' rights. The text of amended subsection (*l*) reveals the opposite purpose — to enhance rather than erode procedural protections. Subsection (*l*) provides baseline rights to employees challenging adverse access determinations: to receive notice, to be heard, and to have an objective decision-maker. The 1991 version permitted licensees to provide for management-level review but did not explicitly require it. Nothing in the 1991 text prevented a licensee from, for example, giving review authority to the same person who issued the initial denial or to a non-managerial employee who was supervised by the initial decision-maker. The change in 2009 from "may be" to "must provide"

clarified that the internal management review is a required procedural floor of protection for employees. We see no basis for inferring that the internal review was also a procedural ceiling. Subsection (*l*) does not bar arbitral review of unescorted access denials.

B.  *Paragraph (a)(4)*

Turning to paragraph (a)(4), which does not specifically address review procedures at all, we find its language susceptible to more than one interpretation on the availability of arbitral review. The paragraph states in its entirety:

> The licensee or applicant may accept, in part or whole, an access authorization program implemented by a contractor or vendor to satisfy appropriate elements of the licensee's access authorization program in accordance with the requirements of this section. *Only a licensee shall grant an individual unescorted access.* Licensees and applicants shall certify individuals' unescorted access authorization and are responsible to maintain, deny, terminate, or withdraw unescorted access authorization.

10 C.F.R. § 73.56(a)(4) (emphasis added). Exelon argues that the italicized second sentence means that a licensee's decision cannot be reviewed by an arbitrator or even a court.[2]

---

[2]  Exelon has not relied on the final sentence of paragraph (a)(4) to support its position. The sentence is materially unchanged

(continued...)

Taken in isolation, that italicized sentence might support Exelon's reading. In regulatory and statutory construction, however, context is critical. *E.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning — or ambiguity — of certain words or phrases may only become evident when placed in context.").

The relevant context of the disputed sentence in paragraph (a)(4) is its placement in an introductory paragraph about the relationship between a licensee and its contractors and vendors. The amended access regulations permit a licensee to rely on contractors and vendors in implementing its access authorization program. Paragraph (a)(4)'s manifest function is to clarify the respective responsibilities of these different categories of regulated parties. The first sentence allows a licensee to delegate some authority to contractors and vendors in implementing its access authorization program. That relationship is elaborated in greater detail in later provisions. The disputed second sentence provides a corollary to this delegation. While a licensee "may accept" steps performed by "a contractor or vendor" to implement its access authorization program: "Only a licensee shall grant

---

[2] (...continued)
from the 1991 version of paragraph (a)(4), and the Commission itself has taken the position that the 1991 regulations did not bar arbitral review of access denials. The minor changes in wording in the 2009 version of the last sentence therefore do not indicate any intent to change that position.

an individual unescorted access." This sentence's role is thus to caution that, notwithstanding the parts that contractors and vendors may play in program implementation, the ultimate responsibility for granting unescorted access belongs to the licensee. Exelon's reading loses sight of the context of paragraph (a)(4) and, if taken to its logical conclusion, would lead to the improbable result of preventing courts — and perhaps even the Commission itself — from granting unescorted access.[3]

To reconcile its position with the contractor-vendor context of paragraph (a)(4), Exelon offers the imaginative theory that arbitrators actually *are* vendors under the regulations because they are "performing an 'element[ ] of the licensee's access authorization program.'" The Commission has not defined "contractor" or "vendor" in the relevant regulations. See 10 C.F.R. § 73.2 (definitions section). The regulations provide, however, that a vendor's employees must themselves satisfy the program requirements to obtain unescorted access to nuclear facilities. See 10 C.F.R. § 73.56(b)(2) ("employees

---

[3] During oral argument, Exelon embraced this very position. Asked whether a court in a race discrimination case, for example, could order access privileges restored to an employee after a licensee had revoked them in violation of Title VII of the Civil Rights Act of 1964, counsel said no. No authority was cited to support this view, which would present serious separation-of-powers issues and in any event conflicts with the Commission's clear position that, in a case of a mistaken access denial, "an aggrieved individual could commence an action in a State or a Federal court." 56 Fed. Reg. 18997, 19002 (1991).

of a contractor or a vendor who are designated in access authorization program procedures, are subject to an access authorization program that meets the requirements of this section"). During oral argument, Exelon conceded that arbitrators have never been subject to unescorted access program requirements. In other words, neither the nuclear industry nor the Commission has ever treated labor arbitrators as vendors under the access regulations. In the face of Exelon's improvised and creative argument, we give this long-standing practice "considerable weight." See *Davis v. United States*, 495 U.S. 472, 484 (1990). We find no support for Exelon's expansive conception of vendor.

In light of its context in allocating responsibility for access programs between licensees and their vendors and contractors, the disputed sentence of subsection (a)(4) — "Only a licensee shall grant an individual unescorted access"— is at best ambiguous on the availability of arbitral review. We therefore turn to the rulemaking record of the 2009 amended access regulations for evidence of the Commission's intent. The lessons from that record are clear.

As noted, the Commission policy since 1991 has been that labor arbitrators may review denials and revocations of unescorted access. Nothing in the rulemaking record for the 2009 amendments indicates any intent to change that policy. The Commission's own analyses of amended paragraph (a)(4) — both as proposed and as adopted — overwhelmingly support Local 15's limited, context-based reading over Exelon's expansive one. In

its proposed rulemaking notice, the Commission emphasized that the changes to paragraph (a)(4) were intended to "convey more clearly" that contractors and vendors were "accountable" not only to licensees but also to the Commission itself and that contractors and vendors "may be directly subject to NRC inspection and enforcement actions." 71 Fed. Reg. 62664, 62734-35 (2006). Likewise, in its statement accompanying the final rule, the Commission stated that it revised paragraph (a)(4) in the final rule "to define and to provide clarification and specification on the roles and responsibilities of licensees, applicants, and contractors or vendors." 74 Fed. Reg. 13926, 13947 (2009).

More telling, the Commission repeatedly stated that amended paragraph (a)(4) "*retains* the intent" of the original version. See 71 Fed. Reg. at 62734-75 (Proposed paragraph (a)(4) "would . . . *retain* the intent of the current requirement that only licensees and applicants have the authority to grant or permit an individual to maintain unescorted access to nuclear power plant protected and vital areas.") (emphasis added); 74 Fed. Reg. at 13962 (Final subsection 73.56(a) "*retains* the intent of the preexisting requirements that licensees have the authority to grant or deny an individual unescorted access authorization, or permit an individual to maintain or terminate unescorted access.") (emphasis added). The rulemaking history of paragraph (a)(4) shows that its purpose was to underscore the authority of licensees for program implementation as distinct from contractors and vendors. This record belies the notion that the Commission revised paragraph (a)(4) to impose a backdoor prohibition on any third-party review of access denials.

Most important, though, is the utter silence in the rulemaking record on the issue of arbitral review of access denials. There is simply nothing from the entire process — from the notice of proposed rulemaking to the public comments to the Commission's own response and final rulemaking analysis — that suggests the Commission intended to change its established policy permitting arbitrators to review access decisions. The Commission's analysis of proposed subsection (*l*) (the part of the regulations that actually addresses review procedures) again emphasized policy continuity rather than change: "Proposed § 73.56(*l*) would *retain* the meaning of current [provision] but update some of the terms used in the provision." 71 Fed. Reg. at 62784 (emphasis added).

This policy continuity is especially important in the context of subsection (*l*), for there is no doubt that its 1991 version permitted arbitral review of access denials. The issue of arbitral review was a significant controversy when the 1991 rule was issued. Some licensees objected to any requirement for a review process, while organized labor representatives raised questions about the implications for workers' grievance rights. In its published analysis of the final 1991 rule, the Commission assured union leaders and everyone else in the industry that it "never intended that any review procedure that already exists in a bargaining agreement be abandoned." 56 Fed. Reg. at 19002. The Commission spelled out that the review proceedings set forth in subsection (*l*) could be conducted by a neutral arbitrator: "if procedures under collective bargaining

agreements" so provide, "the rule would allow the use of a grievance procedure for review of denials or revocations of access authorizations." *Id.* In assuaging the industry's concerns about third parties like arbitrators deciding disputes over access, the Commission made clear that such review was permissible: "if the evidence indicates a proper application of relevant criteria in excluding an employee, the review procedure . . . should result in a decision vindicating the management action." *Id.* at 19003. In short, the Commission's unequivocal and reasoned position in 1991 was that what is now subsection (*l*) established a procedural floor that could be exceeded by providing for arbitral review of access decisions.[4]

---

[4] Federal courts have also taken this view of the 1991 version of the regulation. See *Tennessee Valley Auth. v. Tennessee Valley Trades & Labor Council*, 184 F.3d 510, 518-19 (6th Cir. 1999) (holding that arbitrator's decision to reinstate nuclear employee after licensee revoked his unescorted access and then fired him was "not contrary to federal law or regulation" and that "the arbitrator was acting within the scope of the authority granted to him by the [collective bargaining] Agreement"); *Public Service Elec. & Gas Co. v. Local 94 Int'l B'hood of Elec. Workers*, 140 F. Supp. 2d 384, 392 (D.N.J. 2001) ("the Court finds the historical record persuasive that the NRC's intent was to permit an arbitration provision to be utilized as the appeal process for revocation or denial of site access authorization when appropriate, especially in consideration of the NRC's response that it was not its intent to 'exclude from consideration or to require consideration of

(continued...)

Nothing in the text of the amended regulation or the rulemaking history suggests the Commission came to a different conclusion in 2009. Yet Exelon contends that the Commission sought to upend its settled policy even though the text of the amended regulation does not support such an intent, and even though neither the Commission nor any other participant in the notice-and-comment process gave any indication that the amendments would have this effect.

We will not so lightly accuse the Commission of making a significant policy decision by such indirect tactics. We may safely assume that if the Commission had wanted to depart from its clear policy allowing arbitration of access denials and revocations, it would have said so — at least in its commentaries on the proposed and final rules if not in the text of the amended rule itself. "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The same is true, or at least should be true, of agencies subject to the Administrative Procedure Act.

The silent rulemaking record is a valuable clue. After a famous racehorse was stolen from a stable in the

---

[4] (...continued)
access authorization issues in the collective bargaining process'"), quoting 56 Fed. Reg. 19006, *aff'd*, 27 F. App'x 127 (3d Cir. 2002).

middle of the night, Sherlock Holmes famously deduced that if the thief had been a stranger, the watchdog would have barked. See Arthur Conan Doyle, "Silver Blaze," in *The Memoirs of Sherlock Holmes* 7, 32 (Julian Symons ed., 1950). In this case, the failure of the Commission or even a single public comment to mention the controversial issue of arbitral review in the 2009 rulemaking process "can be likened to the dog that did not bark." See *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991); see also *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 602 (1980) (Rehnquist, J., dissenting) ("In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night.").

Whether one's preferred metaphor features dogs and horses or elephants and mice, the point remains the same: when an agency intends to reverse a significant and longstanding policy, courts can reasonably expect it to say something about it. Here, the Commission said nothing, and that says a lot. The regulation's text is at best ambiguous on the question of arbitral review, and the rulemaking record demonstrates that the amended version of section 73.56 does not bar third-party review of unescorted access denial decisions.

C.  *Auer-Seminole Rock Deference and the Industry Interpretation*

As a final reason for barring arbitral review under the amended regulation, Exelon relies on the industry document, NEI 03-01 (Revision 3), and the Commission staff's approval of it. NEI 03-01 (Revision 3) is crystal-clear in asserting that the amended regulation prohibits arbitral or third-party review of access denials. Exelon contends that the Commission adopted the NEI's interpretation as its own, so that the industry's view is entitled to strong deference under *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), and *Auer v. Robbins*, 519 U.S. 452 (1997). Under *Auer-Seminole Rock* deference, an agency's interpretation of its own validly issued regulation is "controlling . . . unless it is plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461.[5]

---

[5] The Supreme Court's application of *Auer-Seminole Rock* deference has been "sporadic." William N. Eskridge, Jr. & Lauren E. Baer, *The Contiuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from Chevron to Hamdan*, 96 Geo. L.J. 1083, 1103-04 (2008) (finding that between 1984 and 2006, "*Seminole Rock* was employed in a mere 7.1% of eligible cases" by the Supreme Court). Even so, the doctrine has survived various attempts to inter it. Compare *Talk America, Inc. v. Michigan Bell Telephone Co.*, 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring) (criticizing *Auer-Seminole Rock* deference based on separation-of-power concerns), quoting Montesquieu's *Spirit of the Laws* and citing John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612 (1996), and

(continued...)

For three independently sufficient reasons, we conclude that *Auer-Seminole Rock* deference does not apply here. First, *Auer-Seminole Rock* deference is not appropriate when there is "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Talk America, Inc.*, 131 S. Ct. at 2261, quoting *Auer*, 519 U.S. at 462. Without the agency's own considered answer to the interpretive question, nothing could deserve deference. See *Chase Bank*, 131 S. Ct. at 882, citing *Smith v. City of Jackson*, 544 U.S. 228, 248 (2005) (O'Connor, J., concurring in judgment) (noting that deference is not warranted when "there is no reasoned agency reading of the text to which

---

5   (...continued)

*Thomas Jefferson Univ.*, 512 U.S. at 525 (Thomas, J., dissenting, joined by Stevens, O'Connor, and Ginsburg, JJ.) (criticizing *Auer* on the ground that it rewards agencies that "issue vague regulations"), with *Talk America*, 131 S. Ct. at 2260, 2262-63 (majority opinion) (applying *Auer*), and *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011) (same). This court previously commented that "[p]robably there is little left of *Auer*." *Keys v. Barnhart*, 347 F.3d 990, 993 (7th Cir. 2003). While the doctrine raises serious separation-of-powers and administrative law concerns, that pronouncement was either an exaggeration or premature. Justice Scalia is willing to "reconsider" *Auer-Seminole Rock* deference, *Talk America*, 131 S. Ct. at 2266 (Scalia, J., concurring), and the Court may soon have an opportunity to do so. See *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383 (9th Cir. 2011) (rejecting *Auer-Seminole Rock* deference to agency interpretation), *cert. granted*, 132 S. Ct. 760 (Nov. 28, 2011).

we might defer"). That is the case here, for Regulatory Guide 5.66 says nothing about the availability of arbitral review.

Nor did the Commission staff incorporate by reference the NEI's position merely by describing the industry guidance as "an acceptable approach" that "meet[s] the intent and substance of 10 C.F.R. § 73.56." That boiler-plate statement of tepid approval for the industry stan-dards is too vague to qualify as the Commission's own authoritative interpretation for *Auer-Seminole Rock* pur-poses. It is a long way even from a case in which the agency has submitted an *amicus* brief that addresses the interpretive question decisively. In *Chase Bank*, for example, the Supreme Court gave *Auer-Seminole Rock* deference to the Solicitor General's interpretation of a Federal Reserve Board regulation, even though the Board's staff seemed to have interpreted the reg-ulation differently. 131 S. Ct. at 882. A unanimous Court refused to give deference to the "Official Staff Com-mentary" because it "largely replicates the ambiguity present in the regulatory text, and therefore it offers us nothing to which we can defer with respect to the precise interpretive question before us." *Id.* Similarly here, the Commission staff's regulatory guide does not address "the ambiguity present in the regulatory text" on the issue of arbitral review. Regulatory Guide 5.66 therefore "offers us nothing to which we can defer with respect to the precise interpretive question before us." *Id.* Because the NEI's interpretation — no arbitral re-view — contradicts the Commission's last clear state-ment on the issue in its analysis of the 1991 final rule,

we have "reason to suspect that the interpretation does not reflect the *agency's* fair and considered judgment on the matter in question." See *Auer*, 519 U.S. at 462 (emphasis added).

Second, the Commission itself has disclaimed the use of regulatory guides as authoritative or binding interpretations of its own rules. Regulatory Guide 5.66 itself states that "guides are not substitutes for regulations and compliance with them is not required" and that the "NRC staff does not expect any existing licensee to use or commit to using the guidance in this regulatory guide." U.S. Nuclear Regulatory Commission, Regulatory Guide 5.66 (Revision 2) at 4 (Oct. 2011), *available at* http://www.nrc.gov/reading-rm/doc-collections/reg-guides/. Moreover, in the same chapter as the amended access regulations, the Commission has provided: "Except as specifically authorized by the Commission in writing, no interpretations of the meaning of the regulations in this part by any officer or employee of the Commission other than a written interpretation by the General Counsel will be recognized as binding upon the Commission." 10 C.F.R. § 73.3. In other words, through both the disclaimer and its formal regulations, the Commission itself has told the courts that the Regulatory Guide does not deserve *Auer-Seminole Rock* deference. Because Regulatory Guide 5.66 did not offer "authoritative glosses" on the amended access regulation, it cannot deserve *Auer-Seminole Rock* deference. Cf. *United States v. Raupp*, No. 11-2215, 2012 WL 752389, at *3 (7th Cir. Mar. 9, 2012) (treating Sentencing Commission's applica-

tion notes as authoritative interpretations of Sentencing Guidelines deserving deference).

Finally, *Auer-Seminole Rock* deference would not be appropriate even if the staff had actually endorsed the NEI's interpretation. The APA does not permit the Commission staff to contradict a prior interpretation of the Commission itself. To promulgate a "legislative rule," an agency subject to the APA must comply with the notice-and-comment rulemaking procedures of 5 U.S.C. § 553. These procedural requirements do not apply to "interpretive rules" or "general statements of policy." 5 U.S.C. § 553(b)(A). However, all "interpretations of general applicability" and "statements of general policy" must be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). When the Commission concluded that the 1991 access regulations permitted arbitral review, it properly published this generally applicable position in the Federal Register. To reverse this position and prohibit arbitral review, perhaps the Commission could have done so in the same manner — by announcing the change in a "reasoned analysis" published in the Federal Register. See *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."). Then again, such a change might also be deemed significant enough to constitute a substantive rule requiring full notice-and-comment procedures. See *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well-established

that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation.").

What the Commission clearly could *not* do was overrule its prior policy by having its staff issue an unpublished guidance statement without any reasoned explanation for the change. Such stealth rulemaking, which we do not believe actually occurred here, would undermine democratic transparency and upset the settled expectations of regulated parties. It would certainly be unworthy of *Auer-Seminole Rock* deference, and it might well flunk the "arbitrary-and-capricious" standard of review under the APA. See *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, ___, 129 S. Ct. 1800, 1811 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy. . . .") (internal citation omitted); *Wyeth v. Levine*, 555 U.S. 555, 577 (2009) (declining to give deference to FDA's preamble to a final rule in part because it "reverses the FDA's own longstanding position without providing a reasoned explanation").

Because the Commission has not offered its own authoritative view, Exelon is effectively arguing that we give *Auer-Seminole Rock* deference to the industry's interpretation. For obvious reasons, we decline to do so.

Congress may delegate lawmaking authority to agencies. There is room to debate the extent to which courts should defer when agencies have delegated some interpretive responsibility to their staffs.[6] But agency staffs certainly may not delegate responsibility to the parties they regulate. See *Gerber v. Norton*, 294 F.3d 173, 185-86 (D.C. Cir. 2002) ("Nor may the agency delegate its responsibility to the regulated party."). Of course, there is no evidence that the Commission staff did so here, for, as we have said, Regulatory Guide 5.66 does not embrace the NEI's interpretation as the Commission's own and comes with strong disclaimers. *Auer-Seminole Rock* deference does not apply to NEI 03-01 (Revision 3) or Regulatory Guide 5.66.

---

[6] See *Keys v. Barnhart*, 347 F.3d 990, 993-94 (7th Cir. 2003) ("It is odd to think of agencies as making law by means of statements made in briefs, since agency briefs, at least below the Supreme Court level, normally are not reviewed by the members of the agency itself; and it is odd to think of Congress delegating lawmaking power to unreviewed staff decisions."). In the context of an agency's interpretation of a statute, now-Justice Kagan has argued that courts should give *Chevron* deference only when the "congressional delegatee" (generally, the agency head) "takes personal responsibility for the decision." See David J. Barron & Elena Kagan, *Chevron's Nondelegation Doctrine*, 2001 Sup. Ct. Rev. 201, 204. Applying this limitation to *Auer-Seminole Rock* deference would advance the same values of administrative "accountability and discipline in decision making." *Id.* See also note 4, *supra*.

III. *Conclusion*

   We REVERSE the judgment of the district court and REMAND the case with instructions to enter summary judgment in favor of Local 15.